IN THE SUPREME COURT OF TENNESSEE
AT KNOXVILLE
May 8, 2012 Session

## READY MIX, USA, LLC v. JEFFERSON COUNTY, TENNESSEE

**Appeal by Permission from the Court of Appeals, Eastern Section
Chancery Court for Jefferson County
No. 99113      Jon Kerry Blackwood, Senior Judge**

_____

**No. E2010-00547-SC-R11-CV - Filed August 30, 2012**

_____

The plaintiff, a producer of construction aggregates, acquired property with proven reserves for mining and quarrying operations. Afterward, Jefferson County enacted a comprehensive zoning ordinance limiting the use of the property to agricultural purposes. Before the passage of the ordinance, the plaintiff undertook various activities designed to establish business operations. When the county issued a stop work order, the plaintiff, without first receiving a decision from the county's board of zoning appeals, filed a declaratory judgment action arguing that the portion of the property not previously subject to zoning qualified as a pre-existing non-conforming use, protected by Tennessee Code Annotated section 13-7-208 (1992). After concluding that the plaintiff was not required to exhaust its administrative remedies, the trial court ruled that the business activities on the property were "in operation" at the effective date of the ordinance for purposes of grandfather protection under section 13-7-208. Because the Court of Appeals held that the plaintiff had failed to exhaust its administrative remedies, the judgment was set aside. We hold that the trial court, under these circumstances, did not err by ruling that the plaintiff was not required to exhaust the administrative remedies. We further hold that the evidence does not preponderate against the trial court's finding that the plaintiff had established operations sufficient to qualify for protection under Tennessee Code Annotated section 13-7-208.

**Tenn. R. App. P. 11; Judgment of the Court of Appeals Reversed; Judgment of the
Trial Court Reinstated**

GARY R. WADE, J., delivered the opinion of the Court, in which CORNELIA A. CLARK, C.J., JANICE M. HOLDER, and SHARON G. LEE, JJ., joined. WILLIAM C. KOCH, JR., J., filed a concurring opinion.

Arthur G. Seymour, Jr. and Benjamin C. Mullins, Knoxville, Tennessee, for the appellant, Ready Mix, USA, LLC.

S. Douglas Drinnon and Larry Ray Churchwell, Dandridge, Tennessee, for the appellee, Jefferson County, Tennessee.

## OPINION
### I. Facts and Procedural History

In 1998, Jefferson County (the "County"), the defendant in this suit for declaratory judgment, enacted a comprehensive zoning ordinance which limited the use of a parcel of land located on Old Andrew Johnson Highway in the New Market community to agricultural purposes. The plaintiff, Ready Mix, USA, LLC ("Ready Mix"), the current owner of the property, is the successor entity to the original plaintiff, American Limestone Company, Inc. ("ALC"),[1] which was a subsidiary of American Smelting and Refining Company ("ASARCO"), the prior record owner. In some portions of the opinion, Ready Mix, ALC, and ASARCO will be referred to collectively as "the Company."

The "Grasselli property"[2] ("the property"), which is the subject of this litigation, consists of approximately 300 acres. From the 1880s until 1967, a variety of companies used the property for both surface and subsurface mining. In 1971, ASARCO acquired the property as future aggregate mineral reserves,[3] which were estimated at 149 to 150 million tons in weight. No zoning regulations existed at that time. In 1989, ASARCO, which leased various portions of the land for agricultural purposes, asked for and received permission from the property assessor for the land to be classified as agricultural for real estate tax purposes.[4]

---

[1] ALC representatives testified that Rinker Materials acquired ALC in 2000 and that Ready Mix acquired Rinker Materials in 2008. While the record does not provide details of these acquisitions, two of the witnesses—Travis Paris and Charles Crosby—have remained employees throughout the acquisitions, and the corporate offices have remained at the same address.

[2] Because Grasselli Chemical Company once owned the property, it was referred to at trial as the "Grasselli property."

[3] Reserves, according to trial testimony, are "future deposits . . . that [the owner] could develop and turn into aggregates that [it] could market and sell."

[4] See Tenn. Code Ann. § 67-5-1008 (2011). Section 67-5-1008 provides, in pertinent part:

(b)(1) After a parcel of land has been classified by the assessor of property as agricultural, forest, or open space land under the provisions of this part, the assessor of property shall record it on a separate list for such classified property, and the assessor shall record with the register of deeds the application for such classification of the property. Any fees that may be required shall be paid by the property owner.

(2) Henceforth, the assessor shall appraise the land and compute the taxes each year based
(continued...)

-2-

ASARCO did not engage in any active mining operations on the property from 1971 until 1998.

In 1992, Jefferson City, pursuant to a statute authorizing municipalities to zone "territory adjoining but outside of" its boundaries, enacted an ordinance that applied to approximately one-half of ASARCO's property.[5] The zoning boundary traversed the property from northwest to southeast. The Jefferson City ordinance classified the area east of the zoning boundary as A-1 agricultural use, which did not include quarrying or surface mining as permissible uses.[6] The property to the west of the boundary remained un-zoned

_____

[4](...continued)
upon both:

(A) The twenty-five percent (25%) of appraised value applicable to property in the farm classification and present use value; and

(B) Farm classification and value as determined under part 6 of this chapter, but taxes shall be assessed and paid only on the basis of farm classification and present use value under the provisions of this part.

[5] In the enactment of the ordinance, the city relied on its extraterritorial zoning powers, pursuant to Tennessee Code Annotated section 13-7-302 (1992), which states, in pertinent part:

Power is hereby granted to the chief legislative body of any municipality to establish by ordinance zones or districts in territory adjoining but outside of such municipality and lying within planning regions in which the municipal planning commission has been designated as the regional planning commission under § 13-3-102, and in which territory the county has no zoning already in force[.]

[6] Jefferson City Zoning Ordinance No. 92-27 provided, in pertinent part, that land zoned as A-1 was

established to provide, within the rural zone, areas of open development and natural features characterized by remoteness, steepness, impermeability or shallowness of soil, high water table, or other features which render uneconomical the provision of urban capacity streets, sanitary sewers, water supply, school, and fire protection or which characteristics render undesirable the present conversion of the area to urban uses. It is intended that such areas permit dwellings occupied by those engaged in full or part-time non-farm employment "baby" farms or estate-sized properties served with on-site sewage disposal. The following uses are permitted:

11-5000.1. Agricultural uses and their accessory structures. Detached single family dwellings. Signs advertising the sale of farm products produced on the premises. Roadside stands for the sale of handicrafts and products of the soil produced primarily or entirely on the premises, provided that no stand shall be located closer than two hundred (200) feet to

(continued...)

by either Jefferson City or Jefferson County.

On June 25, 1998, ALC's president informed ASARCO by letter that the County had a proposed comprehensive zoning ordinance under consideration that might limit the potential uses for the property. This correspondence, in pertinent part, provided as follows:

> Jefferson County is developing zoning regulations. [ALC] . . . has researched the zoning and tells us that we need to get whatever permits are necessary for quarrying as soon as possible and to do a limited amount of quarrying. For this reason, we need to move forward as quickly as possible on this property to establish zoning for a quarry operation before some other type of zoning is put on this property.

In the following month, ALC, recognizing the need to have an additional supply of raw materials so that one of its processing plants was not solely dependent on its other quarries, acquired the subject land from its parent company. ALC informed the property assessor that it would no longer claim the property as agricultural for real estate tax purposes. Almost immediately, ALC began to develop the property with the intent to mine and quarry the aggregates, including gravel and crushed stone. On August 17, 1998, the Jefferson County Commission passed an ordinance which zoned the entire property as agricultural, prohibiting any type of surface mining or quarrying at that location. Pursuant to Tennessee Code Annotated section 13-7-306 (1992), the County's adoption of zoning regulations repealed by operation of law the earlier, extraterritorial zoning by Jefferson City:

> In any county in which regional zoning has been adopted under this part, whenever the county legislative body adopts county zoning to cover at least such regional area and has provided for the administration and enforcement thereof, then and thereby the zoning provided for such regional area under this part is automatically superseded and repealed.

Tenn. Code Ann. § 13-7-306 (1992).

---

[6](...continued)
the nearest residence other than the farmstead with which it is associated.

11-5000.2. Agricultural uses: farming uses such as barns, silos, livestock crops, etc., shall not be regulated under this resolution.

Special use exceptions under the ordinance included churches, cemeteries, airports, golf courses, parks, fairgrounds, home occupations, and public utilities, but not mining or quarrying activities.

-4-

By letter dated November 30, 1998—some three and one-half months after the ordinance was passed—Robert Elwood, the zoning officer for the County, informed ALC that it would be required to apply for re-zoning in order to conduct quarrying activities on the property and directed the Company "not [to] start operations until [it] complies with the 'Jefferson County Zoning Resolution.'" The Company continued its operations, however, and did not receive a stop work order until December 9, 1998.[7] The record indicates that ALC initially requested a hearing before the County's board of zoning appeals to appeal the stop work order.[8] When, however, the hearing was postponed several times, suit was filed before any further consideration of the issue. On August 2, 1999, almost nine months after the issuance of the stop work order, ALC filed a declaratory judgment action against the County seeking to set aside the order on the basis that it had established a pre-existing use on the property pursuant to Tennessee Code Annotated section 13-7-208 and Article 6.2 of the newly adopted Jefferson County Zoning Resolution,[9] the terms of which allow businesses to continue established operations regardless of any prohibitions in the new zoning classification. In the alternative, ALC asserted that the vested rights doctrine operated to bar

---

[7] While the Court of Appeals, Ready Mix, USA, LLC v. Jefferson Cnty., E2010-00547-COA-R3-CV, 2011 WL 2369293, at *1 (Tenn. Ct. App. June 9, 2011), and the County refer to the November 30, 1998 letter as a stop work order, the contents of that letter do not technically support that description. The letter stated, in pertinent part, as follows:

> During our conversation in October, you indicated the intention[] of [ALC] was to start some type of industrial operation on this property. After researching the matter further, I find that this property is in the "Zoning District of A-1" which does not allow any industrial use. Therefore, [ALC] will be required to apply for re-zoning . . . because of the potential for impacting the environment negatively. Do not start operations until your company complies with the "Jefferson County Zoning Resolution."

The trial court found that the December 9, 1998 stop work order was the only such order issued.

[8] Local governments are required to create a county board of zoning appeals. Tenn. Code Ann. § 13-7-106(a) (1992) ("The legislative body of any county which enacts zoning regulations . . . shall create a county board of zoning appeals."). A board of zoning appeals has the authority to "[h]ear and decide appeals where it is alleged by the appellant that there is error in any order, requirement, decision or refusal made by the county building commissioner or any other administrative official in carrying out or enforcement of any ordinance enacted pursuant to this part." Id. § 13-7-109(1).

[9] Article 6.2 of Jefferson County's Zoning Resolution states:

> 6.2. Non-conforming Uses. All buildings and land uses in existence at the time of the adoption of this code shall be allowed to remain unless they are destroyed over sixty (60) percent of their value or vacated for a minimum of six (6) consecutive months. If buildings are destroyed after adoption of this code, any reconstruction must be in accordance with the requirements of the zoning resolution.

the application of the ordinance.

On September 21, 1999, the County responded that ALC had neither exhausted its administrative remedies nor established a pre-existing non-conforming use, and therefore, its operations violated the zoning ordinance. The County filed a motion for summary judgment on March 20, 2000. The suit was delayed when the chancellor entered an order of recusal.[10] Ready Mix, a successor entity of ALC, became the record owner of the property in 2008, some nine years after the initiation of this litigation. The trial court denied the motion for summary judgment in March of 2009. Afterward, the trial court conducted a bench trial over a two-day period.

Travis Paris, a geologist in charge of environmental management for the Company, was originally hired in 1991 and had retained his position throughout various corporate changes. At trial, he testified that because Jefferson City had zoned the eastern portion of the property as agricultural, he recommended that the Company initiate the "production and development of an active operation" on the western portion of the property, which was located outside of the city's zoning limits. He testified that he had further advised the Company that before any mining activity could take place east of the zoning boundary, Jefferson City would have to change the zoning classification from agricultural. Paris prepared a proposed mining plan for the Company, designating optimal locations on the property west of the zoning boundary and proposing a processing plant site. On July 10, 1998, shortly after the title to the property was transferred by ASARCO to ALC, the Company applied for and ultimately received a general storm water permit from the Tennessee Department of Environment and Conservation, which Paris described as the minimum requirement for "anything which disturbs the surface in . . . Tennessee." A letter documented the Company's intent to "make a number of blasts over the next year to establish a presence for zoning and similar purposes." During this period, Paris also submitted an application for an air permit on behalf of the Company, seeking authorization for the use of machinery in its processing of stone.[11] The permit was granted in January of 1999, shortly after the stop work order had been issued by the County. Paris described the reserves on the subject property as "proven reserves," meaning that the reserves had been identified either by sight or by the use of various investigative drilling methods. He pointed out that the Company constantly sought sources of stone reserves, so as to assure uninterrupted

_____

[10] The chancellor entered an order of recusal on October 27, 1999. While a replacement judge was assigned, the motion for summary judgment was never addressed. On May 15, 2008, the Chief Justice assigned Judge Jon Kerry Blackwood to hear the case. See Tenn. Code Ann. §§ 17-2-201 to -202.

[11] Paris explained that processing the mined materials required the use of certain machinery that could not be operated without air permits from the Tennessee Department of Air Pollution Control.

operations and also to "keep competition to a minimum."

Charles Crosby, an employee of Aggregates USA, a division of Ready Mix, acted as overseer of the conversion of the property into an active quarry. In an effort to determine the suitability of the property as a quarry site, Crosby—at a time when ASARCO was the record owner of the tract—identified the location of the mine shaft, the railroad workings, and the already open mining pits. Crosby testified that the first major step after the "scouting" process was to clear the land of overgrown brush and vegetation. The westernmost pit, partially located outside of the city's zoning boundary and referred to as "pit one," was designated as the site of the first operations. On July 23, August 20, and October 1, 1998, the Company conducted three different "shots"—explosions that are designed to break up rock for usage. In order to determine the most effectual manner of removing the rock, the Company consulted with K&W Drilling, a drilling contractor, and Cherokee Explosives, a blasting contractor. From July 1998 until the end of the calendar year, pit one produced 4,600 tons of rock, much of which was used for roadways and a ramp on the property. The remainder was either moved offsite to be crushed or processed and then transported to another location for resale.

Crosby explained that during this period, the Company installed a truck scale, erected a scale house, and set up office operations in a trailer equipped with telephone lines and electricity. The Company also moved heavy equipment and other machinery onto the property in order to complement excavation and quarrying operations, including multiple front-end loaders, a bulldozer, a Trac highlift, an apron feeder, and a rock crusher. Crosby estimated that the Company had spent approximately $112,000 on the conversion of the property into an active quarry. He conceded that a portion of the work was done after Jefferson County had zoned the western portion of the property as agricultural.[12]

_____

[12] Jefferson County Zoning Resolution 98-24 provided as follows:

9.3. Agricultural-Forestry District, A-l.

Uses Permitted. Single family houses, duplexes, agricultural uses and sales including barns, storage sheds, single chasis mobile homes on individual lots, neighborhood commercial convenience uses including barber and beauty shops, gasoline stations, dry cleaners, doctors and veterinarian offices and clinics, grocery stores, repair shops, laundromats, car washes, day care centers, drug stores, customary home occupations, airports and air strips, schools and other government uses, travel trailer parks, campgrounds, marina operations, ventilation facilities for sub-surface mines and semipublic uses including churches.

Uses Prohibited. Any item not specifically noted above, unless the Jefferson County Board of Zoning Appeals deems a proposed use similar to a type listed above.

In 2000, surveyor and engineer Gary Norvell was hired by the Company "to determine the relationship between the zoning map of Jefferson County [and that of] Jefferson City to where excavation had taken place on site." He testified that the Company's blast and excavation areas were in existing quarries between 31 to 101 feet west of the city's zoning boundary. Norvell made no attempt to ascertain the actual location of the drill holes or to determine precisely where the explosives were placed.

Marvin Adam, a consultant with extensive experience in both mining operations and engineering, was hired by the Company to determine "whether or not [there] was an active operation . . . at the time [of the new zoning ordinance]." Prior to his employment in this litigation, Adam, who had been asked to estimate the mineral reserves, determined that the property contained nearly 150 million tons of provable reserves. Much of Adam's testimony addressed the importance of reserves in the mining industry. He described the property's location as an attractive feature and pointed out that proven reserves were particularly valuable as a deterrent to competition. According to Adam, reserves qualified as "an integral part of every mining operation." He explained that "as soon as you exhaust the reserves, you're either out of business or you go someplace else." The following exchange occurred during Adam's redirect examination:

> Q: [Y]ou were asked so even though . . . there are no employees out there, there's no hauling rock, there's no shots being pulled, there's no digging, there's no drilling, there's no quarrying, it is still an active drilling, blasting, rubblizing quarrying operation?
>
> A: That's correct.
>
> Q: And then . . . [defense counsel] said . . . ["]your testimony is that with no activity whatsoever going on that property regarding surface mining or subsurface mining it is an active drilling, blasting, rubblizing quarry operation," and your answer was?
>
> A: That's true. That's what it is.

In Adam's opinion, therefore, the property became an active quarry operation upon acquisition, regardless of any improvements made in preparation of production.

At the conclusion of the Company's proof, the County moved for a directed verdict based on the claim that the Company, by failing to pursue a hearing before the board of zoning appeals, had not exhausted its administrative remedies. When the trial court denied the motion, the County produced two witnesses and the deposition of a third.

-8-

Rodney Martin, a licensed land surveyor, described the city zoning boundary as "pretty close" to that determined by the Norvell survey. In an effort to illustrate that only a minimal amount of activities had occurred west of the city's zoning boundary line prior to the passage of the ordinance, Martin expressed the view that the Company's blast piles and disturbed rock in preparation of operations extended only fifteen feet or so into the area newly zoned by the County.[13]

Robert Elwood, the zoning officer for the County in 1998, testified by deposition that the property had been zoned as agricultural, which did not permit surface mining and quarrying activities. He recalled that, in response to complaints by residents in the area, he had inspected the property in October and November of 1998 to ascertain the extent of the Company's activities. While acknowledging that there had been "some tree cutting and clearing brush," Elwood testified that he did not observe any mining or quarrying activities at that time and only later learned that the Company had taken some "shots" on the property.

Wayne Hinkle was a building inspector for Jefferson City in 1992, the year that Jefferson City enacted the zoning ordinance extending the city's regional zoning boundary. He confirmed that the portion of the Grasselli property on the city side of the regional zoning boundary line was zoned as A-1 agricultural. Hinkle also acknowledged that when Jefferson County adopted the 1998 zoning ordinance, Jefferson City lost its right to zone extraterritorially.

At the conclusion of the proof, the trial court made extensive findings of fact and conclusions of law. After determining that the blasting which had occurred on the property located outside of the Jefferson City zoning boundary was a "permitted" use, the trial court found that the Company had invested between $80,000 and $100,000 in conducting business on the portion outside the city zoning boundary, thereby establishing a non-conforming use entitled to protection—an "operation existing prior to the enactment of the [County] zoning ordinance."[14] The trial court, which considered the "known history of the property for mining" and its "proven resource[s] of approximately 150 million tons," more specifically

_____

[13] Both Norvell's and Martin's surveys indicated that a portion of the Company's blasting efforts had occurred in Jefferson City—east of the city's zoning boundary.

[14] The lawful use of property prior to the enactment of a zoning ordinance but which would have been prohibited afterward is often referred to as a "non-conforming use." 1 Kenneth H. Young, Anderson's American Law of Zoning, §6.01 (4th ed. 1995). When the use is exempted from the application of the ordinance because the property was used in a lawful way when the ordinance took effect, a non-conforming use is considered "grandfathered." Town of Orono v. LaPointe, 1997 ME 185, ¶ 13, 698 A.2d 1059, 1062; Bryan A. Garner, A Dictionary of Modern Legal Usage 390 (2d ed. 1995); see also Lafferty v. City of Winchester, 46 S.W.3d 752, 754 (Tenn. Ct. App. 2000).

found as follows:

> [Because] Jefferson County did not have any zoning regulations[,] . . . the operation of a quarry was a permitted use at the time of acquisition. After acquisition, [ALC] undertook various activities at the property with the intention of mining the aggregates . . . . The property was scouted and the various open pits on the property were located. [Because t]he property was overgrown and needed to be cleared[, ALC] started this process of clearing, as well as establishing roads. Also, [ALC] obtained permits for . . . shots and other permits for the operation of a quarry. . . . Three shots were taken on the property on July 23, August 20, and October 1, 1998. Various equipment was brought to the site, including scales, and crusher, office trailer and vehicles. Much of the rock that was blasted was used for the road infrastructure on the property. A load of rip rap was sold on site to a neighboring County Highway Department. Some of the rap was hauled to the Coy Plant in Jefferson City for processing. Various steps were taken to provide for utilities and phone services for the property.

The trial court distinguished these circumstances from those presented in Dickson County v. Jennette, No. M1999-00054-COA-R3-CV, 2000 WL 1121550 (Tenn. Ct. App. Aug. 9, 2000),[15] an unpublished opinion in a case involving similar facts, where the property owner was deemed not to be entitled to the protection of Tennessee Code Annotated section 13-7-208 because he had made "mere preparations" to operate a quarry before the passage of a zoning ordinance. Here, the trial court cited the lengthy history of the subject property's use for mining purposes, observing that "[o]ld and new maps . . . indicated numerous drilling sites on the property," whereas the owner in Jennette had just acquired the land, which had no prior history of mining and, therefore, no confirmation of reserves. The trial court pointed out other factual differences in the two cases, such as the blasting, the road construction and the amount of equipment moved to the property, and of note, also considered as a factor the testimony of Adam, who emphasized the importance of reserves and described as unique to the industry the lengthy periods of time that reserves might remain unused. Cf. Lamar Adver. Co. v. Farragut, 1986 WL 2639, at *4 (Tenn. Ct. App. Feb. 28, 1986) (the unique nature of a particular business, such as the lack of a specific advertisement on a billboard for a lengthy period of time, is a factor in the determination of "grandfather" status). Referencing the holding in Lamar Advertising as precedent for the nature of the industry as an appropriate consideration in the "grandfather" analysis and yet recognizing that the diminishing assets doctrine had not been addressed by the courts of this state, the trial court applied the doctrine as additional support for its finding that the business was "in operation,"

_____

[15] There was no application for permission to appeal filed with this Court.

-10-

within the meaning of the statute, prior to the adoption of the ordinance.[16]

On direct appeal, a majority of the Court of Appeals reversed the trial court and dismissed the action, holding that the Company had failed to exhaust its administrative remedies by lodging an appeal of the stop work order issued by the County. In a dissenting opinion, Judge Charles D. Susano, Jr. wrote that these circumstances involved legal determinations and did not require any expertise on the part of a building official or board of zoning appeals. In his view, the exhaustion of remedies was neither necessary nor appropriate. Ready Mix, USA, 2011 WL 2369293, at *6-7.

## II. Standard of Review

Because zoning laws are in derogation of the common law and operate to deprive a property owner of a use of land that would otherwise be lawful, such laws are to be strictly construed in favor of the property owner. Edwards v. Allen, 216 S.W.3d 278, 284 (Tenn. 2007). Nevertheless, because the statute at issue—Tennessee Code Annotated section 13-7-208(b)—essentially creates an exception to allow an otherwise invalid use of land, Smith Cnty. Reg'l Planning Comm'n v. Hiwassee Vill. Mobile Home Park, LLC, 304 S.W.3d 302, 310 (Tenn. 2010), any ambiguity regarding the statute's applicability must be construed against the owner of the land. SNPCO, Inc. v. City of Jefferson City, 363 S.W.3d 467, 474 (Tenn. 2012). Hence, the burden is on the property owner to establish that he or she can take advantage of the protections of the statute. Id. at 475.

In a civil action where the trial court sits without a jury, "review of findings of fact by the trial court . . . shall be de novo upon the record . . . , accompanied by a presumption of the correctness of the finding, unless the preponderance of the evidence is otherwise." Tenn. R. App. P. 13(d). Review of a trial court's determinations on issues of law is, however, de novo. Lind v. Beaman Dodge, Inc., 356 S.W.3d 889, 895 (Tenn. 2011).

## III. Exhaustion of Administrative Remedies

Determining the applicability of the administrative remedies doctrine serves as a threshold issue in this appeal. If the Company was required to exhaust its administrative remedies prior to filing a declaratory judgment action—as held by the Court of Appeals—this Court would not be required to consider whether the Company had established a pre-existing use that was "in operation" before the passage of the zoning ordinance which limited the

---

[16]The diminishing assets doctrine, which is fully discussed in the remainder of this opinion, is applied in some jurisdictions when determining whether a mining business qualifies as a pre-existing non-conforming use. The doctrine is intended to accommodate the uniqueness of the mining industry by recognizing that mining companies tend to hold property in reserve to be used in the future when other land resources are depleted.

property to agricultural use.

Initially, Tennessee Code Annotated section 13-7-106 (1992) states, in pertinent part, that "[t]he legislative body of any county which enacts zoning regulations under the authority of this part shall create a county board of zoning appeals." An appeal to the board of zoning appeals "may be taken by any person aggrieved . . . by any grant or withholding of a building permit or by any other decision of a building commissioner or other administrative official, based in whole or in part upon the provisions of any ordinance under this part." Id. § 13-7-108. Further, Tennessee Code Annotated section 13-7-109 grants the board of zoning appeals the power to "[h]ear and decide appeals where it is alleged . . . that there is error in any order, requirement, decision or refusal made by the county building commissioner or any other administrative official in the carrying out or enforcement of any ordinance enacted pursuant to this part[.]"

When a statute provides for an administrative remedy, an aggrieved party must ordinarily exhaust the remedy before seeking to utilize the judicial process. Thomas v. State Bd. of Equalization, 940 S.W.2d 563, 566 (Tenn. 1997); Bracey v. Woods, 571 S.W.2d 828, 829 (Tenn. 1978). In Thomas, this Court observed that the exhaustion of remedies doctrine allows an administrative body to "(1) function efficiently and have an opportunity to correct its own errors; (2) afford the parties and the courts the benefit of its experience and expertise without the threat of litigious interruption; and (3) compile a record which is adequate for judicial review." Thomas, 940 S.W.2d at 566. Nevertheless, unless the statute providing for an administrative remedy requires exhaustion "by its plain words," an administrative appeal is not mandatory. Id.; see also Reeves v. Olsen, 691 S.W.2d 527, 530 (Tenn. 1985). Absent a statutory mandate, the exhaustion of the administrative remedies doctrine is a matter of judicial discretion. Thomas, 940 S.W.2d at 566 n.5; Reeves, 691 S.W.2d at 530; State ex rel. Moore & Assocs., Inc. v. West, 246 S.W.3d 569, 577 (Tenn. Ct. App. 2005). When the issue of exhaustion is discretionary, "[t]his Court will not conclude that a trial court has abused its discretion unless the trial court 'applied incorrect legal standards, reached an illogical conclusion, based its decision on a clearly erroneous assessment of the evidence, or employed reasoning that causes an injustice to the complaining party.'" Bailey v. Blount Cnty. Bd. of Educ., 303 S.W.3d 216, 237 (Tenn. 2010) (quoting State v. Banks, 271 S.W.3d 90, 116 (Tenn. 2008)). A factor for consideration is whether judicial review would "prematurely interrupt the administrative process." Moore, 246 S.W.3d at 577-78. In any event, the exhaustion of an administrative remedy is not required when the party seeking judicial review presents questions of law rather than questions of fact. Bracey, 571 S.W.2d at 830; Fentress Cnty. Bank v. Holt, 535 S.W.2d 854, 857 (Tenn. 1976).

By dismissing the suit for the failure to exhaust administrative remedies, the Court of Appeals relied upon its holding in Moore. Ready Mix, USA, 2011 WL 2369293, at *4-6.

In Moore, a property owner constructed a hotel where the relevant zoning ordinance required a landscape buffer between the hotel and the adjacent property. Moore, 246 S.W.3d at 572. Although the owner constructed a buffer, the zoning administrator refused to issue a certificate of compliance, contending that the buffer did not comply with the requirements of the ordinance. Id. at 572-73. The owner immediately filed a declaratory judgment action, seeking a judgment by the court that the constructed buffer "complied with the requirements of the Metropolitan [Government of Nashville and Davidson County] Code." Id. at 577. The trial court ruled in favor of the owner. Citing the zoning board's "experience and expertise" in interpreting whether the nature of the construction complied with the terms of the code, the Court of Appeals dismissed the suit, holding that the owner first had to lodge an appeal with the board of zoning appeals before filing a declaratory judgment action. Id. at 580. The Court of Appeals explained that because the owner's "challenge was to the zoning administrator's denial of the certificate . . . [rather than] the validity of the ordinance requiring the buffer or the applicability of that ordinance to its hotel," an administrative appeal was required. Id. at 579.

Cherokee Country Club, Inc. v. City of Knoxville, 152 S.W.3d 466 (Tenn. 2004) also provides guidance. Cherokee Country Club acquired adjacent land intending to demolish an unoccupied residence. Id. at 469. The City of Knoxville enacted an "emergency demolition ordinance" designed to prohibit demolition of any property under consideration for historic preservation. Id. By the passage of an emergency ordinance, the City hoped to circumvent the statutory procedural safeguards of notice, hearing, and review which govern zoning ordinances. Id.; see Tenn. Code Ann. § 13-7-203 (2011).[17] When a City building official denied the property owner's application for a demolition permit, the owner filed a declaratory judgment action seeking a writ of mandamus. Cherokee Country Club, 152 S.W.3d at 469. In response, the City argued that the owner should have appealed to the board of zoning appeals before filing suit. Id. at 478-79. After determining that the ordinance constituted a "substantial interference" with the use of the land and thereby qualified as a zoning regulation subject to the notice and public hearing requirements, this Court ruled that an exhaustion of the administrative remedy was unnecessary:

> [Cherokee] did not, however, challenge the Building Official's discretion in denying a demolition permit based on the ordinance. As a result, an administrative appeal to the Building Board of Adjustments and Appeals, which would have

---

[17] Local governmental bodies have no power to regulate land use absent a delegation of authority by the General Assembly. Tennessee Code Annotated section 13-7-201(a)(1) grants that authority subject to notice requirements. Tenn. Code Ann. § 13-7-203(a); see also Tenn. Code Ann. § 13-7-204. Nevertheless, local governmental bodies may use their police powers to enact ordinances relating to health, safety, and welfare without public notice and hearing. Cherokee Country Club, 152 S.W.3d at 471; see 1 Edward Siegler, Jr., et al., Rathkopf's The Law of Zoning and Planning § 1.02 (4th ed. 2003).

been limited to review of the Building Official's discretion, would have afforded no review over the key issues and would have afforded no possible remedy.

Id. at 479.

In this instance, the Company has, in our view, presented a challenge to the applicability of the zoning ordinance rather than to the discretion of the zoning official who issued the stop work order. The complaint required an assessment of whether the Company, by its actions prior to the passage of the zoning ordinance, invoked the protections of Tennessee Code Annotated section 13-7-208 and qualified as a direct challenge to "the applicability of th[e] ordinance" to the property. An administrative appeal to the board of zoning appeals "would have afforded no review over the key issue[]." Cherokee Country Club, 152 S.W.3d at 479. The applicability of the ordinance to the operations of the Company presented a question of law and, therefore, did not require the exhaustion of administrative remedies. Bracey, 571 S.W.2d at 830.

By analogy, the vested rights doctrine, also known as the doctrine of substantial liabilities, provides support for our conclusion.[18] When a property owner has obtained a permit allowing a certain use, and thereafter incurs substantial expenses in reliance on the permit, the use may continue regardless of any zoning changes enacted by a municipality. SCA Chem. Waste Servs., 636 S.W.2d at 437; see also Harding Acad. v. Metro. Gov't of

---

[18] In general, the vested rights doctrine provides that a zoning ordinance may not retroactively deprive a property owner's use of property. According to one authority, two conditions must be met in order to claim protection under the doctrine: (1) prior approval by the governmental authority; and (2) a substantial change in position by the property owner in reliance on the prior approval. 8A Eugene McQuillin, The Law of Municipal Corporations § 25:183 (3d ed. 1986). Long recognized in this state, the doctrine "allows property owners, who have acquired the requisite 'vested' interest under an existing zone, to use and develop the property pursuant to said zone even if a subsequent zoning ordinance is enacted." CK Dev., LLC v. Town of Nolensville, No. M2010-00633-COA-R3-CV, 2012 WL 38287, at *11 (Tenn. Ct. App. Jan. 6, 2012) (quoting Westchester Co. v. Metro. Gov't of Nashville & Davidson Cnty., No. M2004-02391-COA-R3-CV, 2005 WL 3487804, at *3 (Tenn. Ct. App. Dec. 20, 2005)). Nevertheless, "[i]t is well settled that rights under an existing ordinance do not vest until substantial construction or substantial liabilities are incurred relating directly to construction." State ex rel. SCA Chem. Waste Servs., Inc. v. Konigsberg, 636 S.W.2d 430, 437 (Tenn. 1982). The mere issuance of a permit does not result in protection from a zoning change under the vested rights doctrine. Harding Acad. v. Metro. Gov't of Nashville & Davidson Cnty., 222 S.W.3d 359, 367 (Tenn. 2007). Thus, a "municipality may revoke permission for a land use repugnant to a pending and later enacted zoning ordinance, despite the fact that the application for the proposed use conformed to existing regulations, as long as the permit holder has not relied upon the permit to his substantial detriment." Id. In sum, reliance on the vested rights doctrine requires "issuance of a building permit, plus substantial construction and/or expenditures." CK Dev., 2012 WL 38287, at *12 (citing 4 Patricia E. Salkin, American Law of Zoning § 32:3 (5th ed. 2010)). In this instance, of course, the county did not give prior approval to the Company to mine for aggregates.

-14-

Nashville & Davidson Cnty., 222 S.W.3d 359, 367 (Tenn. 2007). It is not necessary to exhaust administrative remedies when bringing a claim under the vested rights doctrine. See, e.g., SCA Chem. Waste Servs., 636 S.W.2d at 432 (bringing claim with writ of mandamus); PEP Props. v. Town of Farragut, No. 1399, 1991 WL 50211 (Tenn. Ct. App. Apr. 10, 1991). Similarly, a claim asserting the protections of Tennessee Code Annotated section 13-7-208 would not be so disruptive as to require an exhaustion of the administrative process. Reeves, 691 S.W.2d at 530.

Aside from the County's motion for directed verdict at the close of the Company's proof, there was no argument presented in the trial court regarding the exhaustion of administrative remedies. The trial court found, as a matter of discretion, that "the [Company] was not required to perfect an appeal to the Board of Zoning Appeals" under these circumstances. Because the primary issue for consideration was the applicability of the "grandfather" statute, we hold that the trial court did not "appl[y] incorrect legal standards, reach[] an illogical conclusion, base[] its decision on a clearly erroneous assessment of the evidence, or employ[] reasoning that causes an injustice to the complaining party." Bailey, 303 S.W.3d at 237.

### IV. Pre-existing Non-conforming Use
Although the County's zoning ordinance would clearly prohibit mining and quarrying on the property, the Company asserts that Tennessee Code Annotated section 13-7-208 protects the operations that began prior to the passage of the ordinance. The power of a county to enact zoning regulations comes from the state. Edwards, 216 S.W.3d at 284; Cherokee Country Club, 152 S.W.3d at 471. Tennessee Code Annotated section 13-7-101, entitled "Grant of zoning power," provides in pertinent part as follows: "The county legislative body of any county is empowered, in accordance with the conditions and the procedure specified in this part, to regulate . . . the uses of land for trade, industry, residence, recreation, agriculture, forestry, soil conservation, water supply conservation or other purposes." Tenn. Code Ann. § 13-7-101(a)(1) (1992). Tennessee Code Annotated section 13-7-102 then provides that "the county legislative body may, by ordinance, . . . divide the territory of the county which lies . . . outside of municipal corporations into districts . . . and within such districts may regulate the erection, construction, reconstruction, alteration and uses of buildings and structures and the uses of land." Id. § 13-7-102.

In an effort to address the concerns of existing businesses using property in such a manner that would be prohibited under newly enacted zoning provisions, the General Assembly enacted Tennessee Code Annotated section 13-7-208 in 1973. The relevant portions of section 13-7-208 at the time the County adopted the ordinance at issue in this case

-15-

provided as follows:[19]

> (b) <u>In the event that a zoning change occurs in any land area where such land area was not previously covered by any zoning restrictions</u> of any governmental agency of this state or its political subdivisions, or where such land area is covered by zoning restrictions of a governmental agency of this state or its political subdivisions, and such zoning restrictions differ from zoning restrictions imposed after the zoning change, <u>then any industrial, commercial or business establishment in operation</u>, permitted to operate under zoning regulations or exceptions thereto prior to the zoning change <u>shall be allowed to continue in operation and be permitted</u>; provided, that no change in the use of the land is undertaken by such industry or business.

> (c) Industrial, commercial or other business establishments in operation and permitted to operate under zoning regulations or exceptions thereto in effect immediately preceding a change in zoning shall be allowed to expand operations and construct additional facilities which involve an actual continuance and expansion of the activities of the industry or business which were permitted and being conducted prior to the change in zoning[.]

Tenn. Code Ann. § 13-7-208(b)–(c) (1992) (emphasis added). Tennessee Code Annotated section 13-7-208(b), often referred to as a "grandfather clause," <u>SNPCO, Inc.</u>, 363 S.W.3d at 474, has been described as "'an exception to a restriction that allows all those already doing something to continue doing it, even if they would be stopped by the new restriction.'" <u>Coe v. City of Sevierville</u>, 21 S.W.3d 237, 243 (Tenn. Ct. App. 2000) (quoting <u>Black's Law Dictionary</u> 629 (5th ed. 1979)). Because "'[p]roperty is usually already in use when it is first zoned, . . . it is inevitable that ideal zoning theory will clash with the existing use of particular pieces of property.'" <u>Custom Land Dev., Inc. v. Town of Coopertown</u>, 168 S.W.3d 764, 772 n.4 (Tenn. Ct. App. 2004) (quoting <u>Lafferty v. City of Winchester</u>, 46 S.W.3d 752, 758 (Tenn. Ct. App. 2000)). Thus, the grandfather clause provides a solution whereby existing users of property may lawfully continue uses that would otherwise violate a zoning ordinance. <u>Smith Cnty.</u>, 304 S.W.3d at 310. The grandfather clause ensures that despite a primary objective of zoning to eliminate non-conforming uses, the use to which the property has been devoted at the time of the enactment of the ordinance may continue without interruption. <u>Syracuse Aggregate Corp. v. Weise</u>, 414 N.E.2d 651, 654 (N.Y. 1980). While some panels of the Court of Appeals have held that section 13-7-208 applies only to ordinances passed by municipalities, and not counties, <u>see, e.g.</u>, <u>Fields v. White</u>, No. 88-250-II, 1989 WL 5456, at *2 (Tenn. Ct. App. Jan. 27, 1989), this Court has expressly ruled that

---

[19] Section 13-7-208(b) in the 1992 version of the code is now codified at section 13-7-208(b)(1).

the statute applies to city and county ordinances.  Smith Cnty., 304 S.W.3d at 311.

In order to invoke the protections of Tennessee Code Annotated section 13-7-208(b), the burden of proof, in what can be appropriately described as a fact-intensive inquiry, rests upon the user of the property to establish

> (1) that there has been a change in zoning (either adoption of zoning where none existed previously, or an alteration in zoning restrictions); (2) that the use to which they put their land was permitted prior to the zoning change; (3) that the business was operating when the change in zoning took effect; and (4) that the current business is the same business that was being conducted when the change in zoning occurred.

SNPCO, Inc., 363 S.W.3d at 475 (footnotes omitted) (internal quotation marks omitted). When applicable, the grandfather protection in section 13-7-208 is neither intended to put a property owner in a more favorable position than he or she was in prior to the zoning ordinance's passage, Abbington Ctr., LLC v. Town of Collierville, No. W2011-00722-COA-R3-CV, 2012 WL 440701, at *6 (Tenn. Ct. App. Feb. 13, 2012), nor to create an extension of time during which a property owner can establish a non-conforming business.  Smith Cnty., 304 S.W.3d at 318.

Courts have frequently addressed the requisite level of activity necessary to establish a pre-existing use.  This analysis involves a determination of whether the "industrial, commercial, or business establishment is in operation." Tenn. Code Ann. § 13-7-208(b).  In order for a use of property to qualify for protection under the statute, the use or "operation" must first have been actually permitted under the relevant laws and regulations prior to the passage of the subject zoning ordinance, and not merely allowed "through lax enforcement." Smith Cnty., 304 S.W.3d at 316 n.18.  As we stated in Smith County, "'[t]he question is at what point will a court recognize that the [property owner] is entitled to protection from a change in zoning that would [otherwise] bar a use [that was] permitted when development or construction was commenced.'" Id. at 317 (quoting Gackler Land Co. v. Yankee Springs Twp., 398 N.W.2d 393, 403 (Mich.1986) (Levin, J., dissenting)); see also Jennette, 2000 WL 1121550, at *8.  If "substantial steps in . . . construction" have taken place and "substantial liabilities" have been incurred, a business qualifies for protection under the statute.  Smith Cnty., 304 S.W.3d at 317; Rutherford v. Murray, No. E2003-01333-COA-R3-CV, 2004 WL 1870066, at *8 (Tenn. Ct. App. Aug. 20, 2004); cf. SCA Chem. Waste Servs., 636 S.W.2d at 437.

In Smith County, this Court made reference to the Court of Appeals' opinion in Rutherford as illustrative of the "substantial steps" necessary to constitute a pre-existing use.

See Smith Cnty., 304 S.W.3d at 317. The owner of an automobile repair shop contended that he was entitled to continue his business operations despite the adoption of a zoning ordinance precluding that use. Rutherford, 2004 WL 1870066, at *7. Just prior to the zoning change, the owner had purchased the land, obtained a building permit, dug and poured footers for the foundation of the garage, and initiated construction of the block walls of the garage. Id. The Court of Appeals ruled that these actions showed "a devotion of the [p]roperty to use as an automobile repair shop" and constituted "substantial steps in the construction of his commercial garage prior to the change in the [z]oning [r]egulations." Id. at *8.

Nevertheless, "mere preparation" of the property for operations is not enough to establish a pre-existing non-conforming use. Smith Cnty., 304 S.W.3d at 317-18; City of Pharr v. Pena, 853 S.W.2d 56, 64 (Tex. Ct. App. 1993). Jennette illustrates that principle. The Court of Appeals ruled favorably for the county, holding that the owner, who had acquired a property without any history of mining for aggregates, was not "in operation"—having "blasted . . . on two occasions, . . . ha[ving] only made one sale of rock[,] . . . [and having acted] under an agreement . . . which provided that they would not themselves operate or allow any other person to operate 'any mining or quarrying business.'" Jennette, 2000 WL 1121550, at *7. The Court of Appeals described the single sale of rock as "an incidental commercial transaction which standing alone is not indicia of an industrial, commercial or business establishment in operation," id. (internal quotations omitted), and also gave weight to the lack of equipment necessary to conduct mining operations:

> It is undisputed that [the] property never had . . . much of the equipment necessary for a full-scale quarry. [The property owner] testified that for the blasting of the rock and the construction of the road, the following equipment was necessary: "[a]n excavator, hoe, backhoe . . . [, a] loader, a loading device of some kind, a dozer to handle any on-site fill, and a track drill and compressor and blasting equipment." [The property owner] stated . . . that in order to start a quarry, they would need "a primary crushing unit, a secondary crushing unit, conveyors to various size of stockpiled areas, a washing system, a dust collection system, and loaders, scale house and complex to be together and more track drills and compressors." [When the ordinance was passed], only the blasting equipment had been placed on site.

Id. at *3. Based largely upon the property owner's description of the operation as a "proposed quarry" and an expert's characterization of the land as an "embryonic green field operation," the court ruled that the quarry was not "in operation" at the time of the zoning changes. Id. at *8.

## V. Diminishing Assets Doctrine

When analyzing whether a particular "industrial, commercial or business establishment [is] in operation," Tenn. Code Ann. § 13-7-208(b), the nature of the business and industry cannot be disregarded. Smith Cnty., 304 S.W.3d at 318-19 (holding that, despite moving mobile homes onto the property, a mobile home park was not "in operation" since regulations required permits to operate such a park, and the property owner had not applied for such permits); Hansen Bros. Enters. v. Bd. of Supervisors, 907 P.2d 1324, 1336-37 (Cal. 1996) (considering the "nature and use" of the mineral extraction business in determining the scope of a pre-existing use); Cnty. of Du Page v. Elmhurst-Chicago Stone Co., 165 N.E.2d 310, 313 (Ill. 1960) (holding that "the ordinary concept of use, as applied in determining the existence of a nonconforming use, must yield to the realities of the business in question and the nature of its operations"). Our courts have recognized that principle in consideration of the grandfather clause in Tennessee Code Annotated section 13-7-208. See, e.g., Lamar Adver. Co., 1986 WL 2639, at *4 (holding that a company had not abandoned billboards because the nature of the industry requires varying levels of outdoor advertising at different times, thereby justifying several periods of non-use).

The diminishing assets doctrine, however, goes further, based upon the principle that mining and quarrying involve a unique use of land. Unlike other non-conforming uses where the land is incidental to the business operations, the mining and quarrying industry is comprised of the excavation and sale of the very natural resources that make up the property. Weise, 414 N.E.2d at 654-55. In Weise, New York's highest court recognized that areas are left in reserve, un-excavated for long periods of time, until their resources are actually needed and that many jurisdictions have adopted the diminishing assets doctrine to settle land use disputes related to that industry. Id. The doctrine provides that reserves yet to be mined, quarried, or excavated are nonetheless pre-existing uses in the event of a more restrictive zoning change: "an owner of a nonconforming use may sometimes . . . have a . . . right to use an entire tract even though only a portion of the tract was used when the restrictive ordinance was enacted." Stephan & Sons, Inc. v. Municipality of Anchorage, 685 P.2d 98, 101-02 (Alaska 1984) (quotation omitted).

In Du Page, the Illinois Supreme Court, while ruling that the holding of property in reserves for future mining uses was sufficient to permit the continuation and expansion of operations despite inconsistent zoning, explained the rationale for the doctrine:

> In a quarrying business the land itself is a material or resource. It constitutes a diminishing asset and is consumed in the very process of use. . . . [I]n cases of a diminishing asset the enterprise is "using" all that land which contains the particular asset and which constitutes an integral part of the operation, notwithstanding the fact that a particular portion may not yet be under actual excavation. It is in the very nature of such business that reserve areas be

-19-

maintained which are left vacant or devoted to incidental uses until they are needed.

Du Page, 165 N.E.2d at 313. A majority of the courts have adopted the doctrine under circumstances similar to the case before us. See Hansen Bros. Enters., 907 P.2d at 1337 (explaining that the "rule [of diminishing assets] is generally applicable in those states in which the question has arisen"); City of Univ. Place v. McGuire, 30 P.3d 453, 458 (Wash. 2001) ("Most courts that have considered the proper scope of a legal nonconforming mining activity have adopted the diminishing asset doctrine."). In Legrand v. Ewbank, 284 S.W.3d 142, 143-45 (Ky. Ct. App. 2008), a portion of a 227-acre tract had been pitted for sand and gravel extraction at the time of a re-zoning. The Kentucky Court of Appeals, adopting the rule in DuPage, held that the diminishing assets doctrine entitled the owner to mine the parcel. While emphasizing that the issue was fact-intensive, the Kentucky court held that the diminishing assets doctrine was not without limitation:

> Were we to hold that mere ownership of property with the intent of mining its resources is sufficient to establish a nonconforming use, mining could be expanded indefinitely under the auspices of a nonconforming use. We believe, therefore, that such uses are not without limitation.
>
> Although we do not impose the impractical limitation that the property be actively mined prior to the enactment of the ordinance, it must have been demonstrably dedicated to that use.

Id. at 146. Recognizing that ownership of the property with the intent to mine was an important factor, but not the exclusive factor, the Kentucky Court of Appeals ruled that the limited activities which had taken place before the zoning were sufficiently established. Id.[20]

---

[20] Other jurisdictions, without adopting or rejecting the doctrine, have held the doctrine inapplicable on the facts. In Crumbaker v. Hunt Midwest Mining, Inc., 69 P.3d 601, 609 (Kan. 2003), the Kansas Supreme Court acknowledged the doctrine but held that it did not apply because the operations had been approved through a conditional use permit which the court distinguished from a prior, non-conforming use. In Town of Levant v. Seymour, 855 A.2d 1159, 1166-67 (Me. 2004), Maine's Supreme Court avoided deciding whether to adopt the diminishing assets doctrine after determining that the property owner failed to express any intention to expand excavation. Only a few jurisdictions have limited the land subject to pre-existing use treatment to those portions of land that were actually being excavated or physically utilized in mining or quarrying operations. See Town of Billerica v. Quinn, 71 N.E.2d 235, 236 (Mass. 1947) (requiring "actual occupation of the land in a manner physically appropriating it" to the operations before extending pre-existing use status); Torok v. Rubber City Sand & Gravel Co., C.A. No. 9136, 1979 WL 207680, at *4 (Ohio Ct. App. June 13, 1979) (adopting the doctrine of diminishing assets, in reliance upon Du Page, 165 N.E.2d at 313). But see Suffield Twp. Bd. of Trustees v. Rufener, 2011-Ohio-3294, No. 2010-P-0061, 2011 WL 2638195, at *7 (Ct. App. June 30, 2011) (stating that the "doctrine of diminishing assets has generally

(continued...)

While the treatment of the diminishing assets doctrine has variations, most of the cases from other jurisdictions demonstrate that courts have, under appropriate circumstances, permitted mining and quarrying companies not only to continue, but to expand operations after a zoning change which would have otherwise prohibited their activities.

### VI. Analysis

The evidence at trial established that the Company engaged in a variety of activities on the property prior to passage of the County ordinance on August 17, 1998. Specifically, the Company applied for water and air permits required for quarrying activities. The Company scouted the property to determine its suitability as a quarry site and located previously excavated mining pits. The Company cleared overgrown brush and vegetation from the roadways, the ramps into the pits, and the inside of the pits so that mining equipment and company vehicles could operate on the property. The Company moved a track loader and dozer onto the property and used the dozer to continue work on the roads and ramps. The Company laid out and completed a blast shot on the property on July 23, 1998. The Company used some of the blast rock for roads on the property, but on July 29 and 30, 1998, hauled the remaining blast rock on trucks to another one of the Company's facilities, where the rock was processed for resale. Finally, on August 14, 1998, the Company prepared the location of a second blast shot, but the second blast actually did not occur until August 20, 1998, subsequent to passage of the County ordinance.

The Company conducted three blasts on the property, the reports of which appear as exhibits in the record. The blasts occurred on July 23, August 20, and October 1, 1998. The location of the July 23, 1998 blast is indicated as being on the "e[ast] wall." The August 20 blast location was at the "n[orth]w[est] wall" and the October 1 blast was at the "n[orth]e[ast] corner of pit." Based on the testimony regarding the location of the Company's operations, all of the blasts took place within pit one, a portion of which is on the western part of the property, an area outside of the city zoning boundary. Because the ordinance was passed and became effective on August 17, 1998, only the July 23 blast can be considered in determining whether the pre-ordinance activities constitute "in operation" for purposes of Tennessee Code Annotated section 13-7-208. Although the monetary amount expended by the Company in relation to these activities was disputed at trial, the trial court found the expenditures on the previously unzoned portion of the property to be approximately $80,000 to $100,000.

Our statute, Tennessee Code Annotated section 13-7-208, provides adequate guidance

---

[20](...continued)
not been used in Ohio").

for a determination of "grandfather" status. The diminishing assets doctrine, while instructive, need not be adopted in order to address the question before us. Nevertheless, the property's history as a mining site and its known reserves qualify as an important factor in the determination of whether the business was "in operation;" that is, "operating when the change of zoning took effect." SNPCO, Inc., 476 S.W.3d at 475. Despite several years of mining inactivity and the property's primary use for agricultural purposes, the expressed purpose of the Company at the time of purchase was to acquire known reserves. It is significant that approximately 150 million tons of proven reserves were located on the property, an essential component of the mining industry. While, as indicated, we are neither prepared to adopt the diminishing assets doctrine in these circumstances nor hold that merely owning property with proven reserves and a history of mining is enough to establish a pre-existing use, the evidence of reserves and the nature of the mining industry are appropriate considerations in the factual determination of whether activities prior to a zoning change are sufficient to establish operations and, therefore, invoke the protections of the statute. In the consideration of whether a particular "industrial, commercial, or business establishment [is] in operation," Tenn. Code Ann. § 13-7-208(b), the unique nature of the industry cannot be ignored. Smith Cnty., 304 S.W.3d at 317-18.

Based upon our extensive review of the record, we hold that the evidence does not preponderate against the trial court's finding that the Company's activities established a pre-existing use and, therefore, qualify for protection under the statute. "Substantial steps" in construction may often satisfy the grandfather clause in section 13-7-208. Smith Cnty., 304 S.W.3d at 317; Rutherford, 2004 WL 1870066, at *8. Similarly, a demonstrated "devotion of the property" towards a particular use can also result in the finding of a pre-existing use protected by section 13-7-208. Rutherford, 2004 WL 1870066, at *8. In summary, the measures taken by the Company aimed at turning the property into an active mine illustrate such a commitment. The combination of these measures, the proven reserves, and the mining history on the property, lead us to conclude that the Company's mining business was "in operation" at the time Jefferson County passed its zoning ordinance.

## Conclusion

Under these circumstances, the Company was not required to exhaust its administrative remedies by appealing the stop work order with the board of zoning appeals of the County. Furthermore, the evidence does not preponderate against the trial court's ruling that the Company had established business operations prior to the passage of the ordinance; therefore, the Company's use of the property at issue is entitled to the protections of Tennessee Code Annotated section 13-7-208. The judgment of the Court of Appeals is, therefore, reversed, and the judgment of the trial court is reinstated. Costs are adjudged against Jefferson County, for which execution may issue, if necessary.

-22-

_____

GARY R. WADE, JUSTICE