IN THE COURT OF APPEALS OF TENNESSEE
AT JACKSON
Assigned on Briefs April 15, 2020

## COOK'S ROOFING, INC. v. HARTFORD UNDERWRITERS INSURANCE COMPANY

**Appeal from the Chancery Court for Shelby County**
**No. CH-07-1140-3   JoeDae L. Jenkins, Chancellor**

———————————————————

**No. W2019-00271-COA-R3-CV**

———————————————————

This appeal involves retrospective insurance premiums for an assigned risk workers' compensation insurance policy. The insured employer is a roofing contractor. The insurance company conducted a retrospective premium audit and determined that the roofing contractor owed retrospective premiums based on the fact that its primary subcontractor was uninsured during a portion of the policy period. The roofing contractor refused to pay the increased premium, so the insurance company canceled the insurance policy. The roofing contractor filed this lawsuit against the insurance company, alleging negligence, promissory estoppel, and violation of the Tennessee Consumer Protection Act. The insurance company filed a counterclaim for the unpaid balance owed for the premiums under the policy. The insurance company filed a motion for summary judgment on all claims asserted by the roofing contractor and on its own counterclaim. The trial court granted the motion for summary judgment, dismissed the claims asserted by the roofing company, and entered judgment in favor of the insurance company and against the roofing contractor for $66,212 plus prejudgment interest. However, the trial court denied the insurance company's subsequent motion to enforce the judgment against the two individuals who operated the roofing company and served as the sole officers and shareholders of the corporation. Both parties raise issues on appeal. For the following reasons, we affirm the decision of the chancery court in part, we reverse in part, and we remand for further proceedings consistent with this opinion.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court Affirmed in Part, Reversed in Part and Remanded**

CARMA DENNIS MCGEE, J., delivered the opinion of the court, in which D. MICHAEL SWINEY, C.J., and FRANK G. CLEMENT, JR., P.J., M.S., joined.

Everett B. Gibson, Memphis, Tennessee, for the appellant, Cook's Roofing, Inc.

Ben M. Rose, Brentwood, Tennessee, for the appellee, Hartford Underwriters Insurance Company.

## OPINION

### I. FACTS & PROCEDURAL HISTORY

Mike Cook was employed by a Memphis roofing company for three years before he and his wife, Rebecca, decided to go into business for themselves in 2003. The Cooks initially operated their roofing business as a sole proprietorship known as Cook's Roofing. Rebecca served as the company bookkeeper, while Mike worked as the "estimator," meeting with customers, collecting payments, and inspecting job sites. However, all of the actual construction work was performed by subcontractors. The sole subcontractor for their roof construction work was Mr. Augustine Chaidez. Mr. Chaidez had enough employees that Cook's Roofing could have crews working on two jobs simultaneously.

Pursuant to Tennessee's Workers' Compensation Law, the Cooks were required to maintain workers' compensation insurance. *See* Tenn. Code Ann. § 50-6-101, *et seq.* In Tennessee, employers are permitted to purchase workers' compensation insurance either in the voluntary market or in the residual assigned risk market. *See Am. Zurich Ins. Co. v. MVT Servs., Inc.*, No. M2011-01266-COA-R3-CV, 2012 WL 3064650, at *2 n.6 (Tenn. Ct. App. July 27, 2012). "An assigned risk plan is insurance approved by the Commissioner of Commerce and Insurance as insurance 'of last resort,' available when an employer is unable to obtain coverage in the voluntary market." *Id.*

The Cooks purchased an assigned risk workers' compensation insurance policy through the Tennessee Workers' Compensation Insurance Plan ("TWCIP"). *See* Tenn. Code Ann. § 56-5-114(c)(1) (directing the commissioner to "implement a plan . . . for the equitable apportionment among insurers of applicants for workers' compensation insurance who are in good faith entitled to such insurance, but who are unable to procure it through ordinary methods"). The policy provided that the insurance premium would be calculated by the use of retrospective rating. As we explained in *American Zurich*,

> This method of insurance premium calculation bases the premium on the total payroll of covered employees during the policy period. It is typically used where the exact composition of the employer's workforce is subject to substantial variation, or where the insured's risk is difficult to measure at the beginning of the policy period. *See* Lee R. Russ & Thomas F. Segalla, 5 *Couch on Ins.3d* § 69:15 (2008). Under the retrospective rating method, the employer deposits an estimated premium with the insurance company at the beginning of the policy period. Shortly after the policy period expires, the

insurance company conducts a routine retrospective premium audit, looking back at the workers who were actually on the insured's payroll during the policy period, utilizing records provided by the insured employer related to employee payroll and classification. The actual insurance premium due for the immediate past policy period is then determined based on the results of the audit. Depending on the audit result, the insured employer may either receive a refund on the premium paid or be required to pay additional premiums to the insurance company.[1]

2012 WL 3064650, at *2.

Mike and Rebecca Cook admittedly knew from the outset that their company might have to pay additional insurance premiums for their workers' compensation insurance coverage if their subcontractor had no coverage of his own for subcontractor employees. The Cooks learned at the beginning of their contractor-subcontractor relationship with Mr. Chaidez that he had no workers' compensation insurance. Because of the possibility that they would be charged additional insurance premiums related to the employees of Mr. Chaidez, the Cooks deducted money from their payments to Mr. Chaidez and retained it for potential insurance premiums. In April 2004, Mr. Chaidez asked the Cooks to discontinue that practice. After consulting with an insurance agency, the Cooks drafted a "letter agreement" that they believed would protect them from liability for their subcontractor's employees. At the same time, they stopped deducting money from their payments to Mr. Chaidez related to the potential premium assessments. However, when their insurance company conducted an audit, the Cooks were informed that the letter agreement was not acceptable. Their insurer assessed an additional retrospective premium of around $30,000. Going forward, the Cooks required Mr. Chaidez to have his own workers' compensation insurance on his employees.

Mr. Chaidez applied for an assigned risk workers' compensation insurance policy utilizing Chenault Insurance Agency. Through the TWCIP, the plan administrator assigned policies to one of several member companies in the assigned risk pool for Tennessee. The insurance company that was assigned to issue the Chaidez policy was Hartford Underwriters Insurance Company.

The Cooks reluctantly paid the additional $30,000 premium assessed by their insurer. However, when the time came to renew their policy, they sought out a different insurance agency because of their dissatisfaction with the advice they were given. Around this time, the Cooks also decided to incorporate their business as Cook's Roofing, Inc.

---

[1] A retrospective rating provision "is a standard provision in workers' compensation insurance policies." *Am. Zurich Ins. Co.*, 2012 WL 3064650, at *11. Such provisions reflect "the reality that any number of employees may be hired or terminated while the policy is in effect, thus increasing or decreasing the amount of risk to which the insurer is exposed." *Id.*

Around June 2005, Cook's Roofing submitted an application for an assigned risk policy using a different insurance agency. They calculated and paid an estimated annual premium of around $4,000.[2] The Cooks were listed as the sole officers of the corporation. Coincidentally, the plan administrator randomly assigned Hartford to issue the Cook's Roofing policy as well. Hartford issued the one-year policy effective from June 2, 2005, to June 2, 2006. The policy contained a standard premium adjustment clause providing that the initial premium paid by Cook's Roofing upon submission of its application was simply an estimate.

On September 9, 2005, Cook's Roofing requested and obtained a certificate of insurance from Chenault Insurance Agency, indicating that its subcontractor, Mr. Chaidez, had been issued a worker's compensation insurance policy of his own. In reliance on the certificate, Cook's Roofing continued to do business with Mr. Chaidez as its sole subcontractor. The Cooks believed that they were "fully protected from assessment of future audit premiums" once they obtained the certificate of insurance regarding the Chaidez policy. However, the certificate stated:

> THIS CERTIFICATE IS ISSUED AS MATTER OF INFORMATION ONLY AND CONFERS NO RIGHTS UPON THE CERTIFICATE HOLDER. THIS CERTIFICATE DOES NOT AMEND, EXTEND OR ALTER THE COVERAGE AFFORDED BY THE POLICIES BELOW.
> . . . .
> INSURED
> Chaidez, Augustine
> . . . .
> THE POLICIES OF INSURANCE LISTED BELOW HAVE BEEN ISSUED TO THE INSURED NAMED ABOVE FOR THE POLICY PERIOD INDICATED. NOTWITHSTANDING ANY REQUIREMENT, TERM OR CONDITION OF ANY CONTRACT OR OTHER DOCUMENT WITH RESPECT TO WHICH THIS CERTIFICATE MAY BE ISSUED OR MAY PERTAIN, THE INSURANCE AFFORDED BY THE POLICIES DESCRIBED HEREIN IS SUBJECT TO ALL THE TERMS, EXCLUSIONS AND CONDITIONS OF SUCH POLICIES. . . .
> . . . .
> CERTIFICATE HOLDER
> Cook's Roofing . . . .
> . . . .
> CANCELLATION
> SHOULD ANY OF THE ABOVE DESCRIBED POLICIES BE

---

[2] "The estimate is determined by the insured, and the insured submits the estimate to the insurance company for approval based on estimated payroll amounts and classification codes." *Am. Zurich*, 2012 WL 3064650, at *2 n.8.

- 4 -

CANCELLED BEFORE THE EXPIRATION DATE THEREOF, THE ISSUING INSURER WILL ENDEAVOR TO MAIL <u>10</u> DAYS WRITTEN NOTICE TO THE CERTIFICATE HOLDER NAMED . . . BUT FAILURE TO DO SO SHALL IMPOSE NO OBLIGATION OR LIABILITY OF ANY KIND UPON THE INSURED, ITS AGENTS, OR REPRESENTATIVES.

The policy binder provided that a copy of all certificates of insurance issued for the policy must be automatically sent to Hartford.[3] However, Chenault Insurance Agency did not send Hartford a copy of the certificate of insurance it issued to Cook's Roofing.

Three months after the certificate of insurance was issued by Chenault Insurance Agency, Hartford cancelled the Chaidez workers' compensation insurance policy on January 3, 2006, due to nonpayment of premium. Hartford issued notice of the cancellation to Mr. Chaidez, but it did not send a copy to the certificate holder, Cook's Roofing, because it had never received a copy of the certificate of insurance informing it that Cook's Roofing was a certificate holder. For purposes of summary judgment in this case, it was undisputed that Hartford did not notify Chenault Insurance Agency about the cancellation of the Chaidez policy either.[4]

In April 2006, Hartford requested that Cook's Roofing provide it with information regarding its subcontractors. In response, Mrs. Cook contacted Chenault Insurance Agency and requested another certificate of insurance for the Chaidez policy. Chenault's employee checked its internal filing system and did not see any notices of cancellation, so she issued the certificate of insurance to Cook's Roofing despite the fact that the Chaidez policy had been cancelled in January 2006. Mrs. Cook then faxed the April 12, 2006 certificate of insurance to Hartford as requested. Again, however, Chenault Insurance Agency did not send a copy of the certificate of insurance it issued for the Chaidez policy to Hartford.

_____

[3] According to Hartford's corporate designee, the TWCIP and related manuals required that insurance agents or producers send copies of certificates of insurance to the insurance carrier due to the fact that there is no relationship between the insurance companies and the insurance agents or producers in this context. The TWCIP expressly provides that insurance agents are not considered to be appointed agents of the insurer carriers. The corporate designee explained that when the insurance carrier receives a copy of a certificate of insurance, it will then list the certificate holder in an automated system so that the certificate holder will receive any subsequent notices of cancellation. Chenault Insurance Agency admittedly does not send copies of certificates of insurance to any carriers but claims that most agencies "just don't do that" in practice. Instead, Chenault Insurance Agency takes responsibility for notifying certificate holders about cancellations if it receives a copy of a notice of cancellation from a carrier.

[4] Hartford's corporate designee testified that it is Hartford's standard practice to send a copy of notices of cancellation to the producing agent, and she had no reason to believe that such notice would not have been sent to Chenault Insurance Agency in this case. However, she said the process is "all mechanical" and completed by a distribution center in another state, so she did not have a separate copy of the producer's copy in the underwriting file. Chenault Insurance Agency claimed that it never received a copy of the notice of cancellation. For purposes of summary judgment, Hartford admitted that it did not send a copy of the notice of cancellation of the Chaidez policy to Chenault Insurance Agency.

- 5 -

According to Mrs. Cook, Hartford did not inform her at this time that the Chaidez policy had been cancelled.[5] As such, Cook's Roofing continued to do business with Mr. Chaidez unaware of the fact that he was uninsured.

The Cook's Roofing policy expired on June 2, 2006, and Hartford proceeded with its retrospective premium audit to determine the actual premium owed by Cook's Roofing for the 2005-2006 policy period. Hartford initially determined that Cook's Roofing owed no additional premium and in fact was entitled to a small refund. However, on August 22, 2006, Hartford issued a "premium adjustment notice" based on a revised audit, indicating that Cook's Roofing owed $33,583 in retrospective premium for the 2005-2006 policy period due to the additional risk from the fact that Mr. Chaidez was an uninsured subcontractor for the latter half of the policy period. Specifically, Cook's Roofing had continued to use Mr. Chaidez to perform its roofing work after the cancellation of his own policy on January 3, 2006, and through the date of expiration of the Cook's Roofing policy on June 2, 2006.[6]

Because the Cook's Roofing policy had been renewed for an additional one-year period, which was still in effect, Hartford calculated additional premium owed for the existing policy period as well based on the currently uninsured status of the primary subcontractor for Cook's Roofing. Hartford utilized the payroll figures from its 2005-2006 policy period audit to calculate that an additional premium of $35,674 was owed for the existing 2006-2007 policy. As such, on August 30, 2006, Hartford sent Cook's Roofing a premium bill for $66,212 owed toward the two policy periods (after applying some small credits toward the balance for 2005-2006).

Cook's Roofing disputed that it owed any additional premium and refused to pay it. Because they had obtained the certificates of insurance regarding the Chaidez policy, the Cooks believed that they were "fully protected from assessment of future audit premiums." The 2006-2007 Cook's Roofing policy was cancelled by Hartford for nonpayment of premium, effective November 10, 2006. The TWCIP expressly provided that an employer

---

[5] Internal documentation maintained by Hartford states that its representative called Mrs. Cook on April 12, 2006, and spoke with her to request information about the subcontractors currently used by Cook's Roofing. According to the documentation, Mrs. Cook stated that they were only using Mr. Chaidez, and the representative informed her that Mr. Chaidez's policy had been cancelled. In response, according to the handwritten note, Mrs. Cook insisted that they had a current certificate of insurance for Mr. Chaidez and would fax it to Hartford. However, Mrs. Cook submitted an affidavit denying that she ever spoke with the representative by phone. She claimed that Hartford simply requested an updated certificate of insurance for their subcontractor and that she provided it by fax, and she was never told, at that time, that the Chaidez policy had been cancelled. Because this case was resolved via motion for summary judgment, we will view the facts in the light most favorable to Cook's Roofing with respect to this issue.

[6] According to the testimony of Hartford's corporate designee, when the Chaidez policy was cancelled, the Cook's Roofing policy became "liable" for injuries that occurred after the cancellation date because there was no insurance for any of the employees of the uninsured subcontractor. As a result, Hartford assessed additional premium to Cook's Roofing.

with an outstanding unpaid insurance premium on a previous policy issued under the plan was ineligible for future coverage under the plan. Hartford notified the plan administrator of the unpaid invoice, and Cook's Roofing could not obtain replacement coverage from a different insurance company in the pool thereafter.

On June 12, 2007, Cook's Roofing filed this lawsuit against Mr. Chaidez, Chenault Insurance Agency, Inc., and St. Paul Travelers ob/o The Hartford Insurance a/k/a Hartford Underwriters Insurance Company ("Hartford").[7] Cook's Roofing asserted claims for breach of contract, negligence, promissory estoppel, and violation of the Tennessee Consumer Protection Act ("TCPA"). Cook's Roofing sought compensatory and punitive damages in addition to a declaration that it did not owe anything to Hartford.

In 2008, Hartford filed an answer and a counterclaim seeking to recover the unpaid balance owed for the two policy periods in addition to pre- and post-judgment interest. The case languished in the trial court for years. Counsel for Cook's Roofing withdrew in 2008, and its claims against Chenault Insurance Agency were dismissed for lack of prosecution in 2010. Hartford filed a motion for default judgment on its counterclaim against Cook's Roofing, which led Cook's Roofing to finally file an answer to the counterclaim in June 2010. Cook's Roofing retained new counsel and filed a motion to set aside the dismissal of its claims against Chenault, which the trial court granted. However, Cook's Roofing would eventually voluntarily dismiss its claims against Chenault Insurance Agency and Mr. Chaidez.

Five years into the litigation, in 2012, Cook's Roofing was permitted to file an amended complaint. The amended complaint omitted the claim for the breach of contract but continued to assert claims for negligence, promissory estoppel, and violation of the TCPA. The amended complaint alleged that Hartford was negligent in failing to give notice of its cancellation of the Chaidez policy in January 2006 and in failing to inform Cook's Roofing about the cancellation of the Chaidez policy when Hartford received the invalid certificate of insurance from Mrs. Cook in April 2006. Cook's Roofing argued that Hartford's actions essentially forced it out of business. It sought compensatory damages including lost profits, in addition to punitive damages, treble damages, and attorney's fees.

Hartford filed an amended answer. Hartford asserted that Cook's Roofing, Inc., had been administratively dissolved by the Secretary of State and that it may be necessary to add its individual owners or shareholders as parties to the litigation. In response, Cook's Roofing represented that its corporate status had been reinstated.

---

[7] According to Hartford, the "real party in interest" among the referenced entities is Hartford Underwriters Insurance Company. Travelers Insurance served as a third-party administrator for Hartford and had some involvement with this case as the servicing insurer with respect to this assigned risk policy. However, for clarity, we will simply refer to "Hartford" throughout this opinion.

A scheduling order provided that the deadline for depositions of fact witnesses was June 30, 2014. On July 31, 2014, Cook's Roofing filed a motion for leave to file a second amended complaint and to modify the scheduling order. Cook's Roofing sought to add an additional count to its complaint for intentional interference with prospective business relationships. The motion to amend was not set for a hearing for another two years. In 2016, Hartford filed a response in opposition to the motion to amend, citing undue delay and unfair prejudice. Hartford noted that the case had been pending for nearly a decade. It also asserted that the proposed amendment was futile because Hartford had not acted with improper motive or means, and the statute of limitations had run in any event. After a hearing, the trial court entered an order on May 24, 2016, denying the motion to amend without elaboration.[8]

On October 5, 2018, Hartford filed a motion for summary judgment seeking dismissal of the claims asserted by Cook's Roofing and also seeking a judgment for $66,212 on its own counterclaim for breach of contract. Hartford asserted that Cook's Roofing was solely responsible for confirming the insured status of its subcontractor before continuing to do business with him. Hartford argued that it acted in accordance with the requirements of the TWCIP and had no duty to notify Cook's Roofing about the cancellation of the policy held by Mr. Chaidez. Thus, Hartford asserted that Cook's Roofing could not prove the elements of its claims for negligence or violation of the TCPA. As for the promissory estoppel claim, Hartford argued that it made no promise to Cook's Roofing regarding the Chaidez policy, as the incorrect certificate of insurance was issued by Chenault Insurance Agency, not Hartford. Hartford argued that in the context of assigned risk policies, an insurance agent or producer is an agent of the insured who is applying for insurance and not an agent of the insurance company that is ultimately assigned to issue the assigned risk policy. In any event, Hartford argued that it was unreasonable for Cook's Roofing to rely on the certificates of insurance. Alternatively, Hartford contended that dismissal of the claims asserted by Cook's Roofing was appropriate because Cook's Roofing failed to exhaust its administrative remedies before the Tennessee Department of Commerce and Insurance.

On its counterclaim for breach of the insurance policy, Hartford sought a judgment for $66,212 in unpaid premium. Hartford attached numerous documents to its motion, including the Tennessee Workers' Compensation Insurance Plan, relevant policy applications, binders, policy terms, certificates of insurance, audit documents, premium bills, and the Chaidez policy cancellation notice. Hartford also submitted deposition testimony from its corporate designee, Mike Cook, Rebecca Cook, David Chenault of Chenault Insurance Agency, and the employee of Chenault Insurance Agency who issued the second certificate of insurance on the cancelled policy.

---

[8] Initially, Chancellor Kenny W. Armstrong had presided over the proceedings. The order denying the motion to amend was entered by Chancellor James R. Newsom, III.

Cook's Roofing filed a response. Regarding exhaustion of administrative remedies, Cook's Roofing argued that no statute mandated an administrative appeal under the circumstances, and therefore the common law rule would apply and give the court discretion as to whether the case should be dismissed. As for its negligence claim, Cook's Roofing insisted that its claim was "unrelated to contractual duties" and that Hartford was "especially careless" in failing to notify Chenault Insurance Agency of the cancellation of the Chaidez policy. Regarding the subsequently issued certificate of insurance, Cook's Roofing asserted that Chenault Insurance Agency was the agent of Hartford for the purpose of issuing certificates of insurance. It also argued that Hartford had an obligation to "alert" certificate holders such as Cook's Roofing that the April 2006 certificate of insurance was invalid. Cook's Roofing argued that Hartford caused it "to be misled into believing that there was no insurance premium financial risk attaching to its doing business with Mr. Chaidez." According to Cook's Roofing, Hartford's actions "were the sole cause of [Cook's Roofing] falling into the trap" of the $30,000 retrospective audit premium. As such, Cook's Roofing asserted that Hartford's counterclaim should be denied on unjust enrichment grounds. Cook's Roofing also disputed the amount that it would owe for the cancelled 2006-2007 policy. It pointed out that there was no post-cancellation audit for the partial policy term and suggested that the amount claimed by Hartford was based on the original estimate for a twelve-month policy. Cook's Roofing claimed that the actual amount owed was therefore unknown. In support of its response, Cook's Roofing submitted numerous documents, including policy terms, premium bills, letters, the certificate of insurance, affidavits of Mike and Rebecca Cook, and deposition testimony from Mr. Chenault and representatives of Hartford.

After a hearing, the trial court entered a thirteen-page order granting summary judgment to Hartford, entering judgment on its counterclaim and dismissing all claims asserted by Cook's Roofing.[9] The court made lengthy findings of fact and conclusions of law. It summarized the case as a dispute over premiums owed to Hartford for a workers' compensation insurance policy issued to Cook's Roofing under the TWCIP. It described the policy at issue and its premium adjustment clause, which provided that the initial premium was only an estimate and not necessarily the amount that would be owed after an audit was conducted at the end of the term. The court found that Cook's Roofing agreed to pay the premium based on all employees or other persons engaged in work that could make Hartford liable under the policy, including Mr. Chaidez.

The trial court found that Mr. Chaidez had also obtained his policy through the TWCIP, with the assistance of Chenault Insurance Agency, an insurance producer assisting Tennessee businesses in securing workers' compensation insurance under the plan. The trial court found that Chenault Insurance Agency was acting as the legal agent of Mr. Chaidez, not as the agent of Hartford. The trial court noted that the Chaidez policy and the Cook's Roofing policy were both coincidentally randomly assigned to Hartford but that

---

[9] By this time, Chancellor JoeDae L. Jenkins was presiding over the case.

they were completely separate contracts, and there was no relationship between Hartford and Cook's Roofing with respect to the Chaidez policy. The trial court found that Hartford cancelled the Chaidez policy effective January 3, 2006, for nonpayment of premium. The trial court acknowledged that evidence was presented suggesting that Chenault Insurance Agency may not have received a copy of the cancellation notice from Hartford on the Chaidez policy; however, there was no dispute that Mr. Chaidez received a cancellation notice. As such, the trial court found that the Chaidez policy was effectively cancelled pursuant to Tennessee law and the TWCIP.

The trial court found that Mrs. Cook provided a certificate of insurance to Hartford that incorrectly stated that the Chaidez policy was still in effect. However, the court found that the certificate of insurance was faulty and not indicative of actual insurance coverage. The court found that Mrs. Cook could have verified the policy with Hartford, but instead she merely relied on the certificate of insurance issued by Chenault Insurance Agency. The court noted that Chenault Insurance Agency did not contact Hartford either. The trial court found that the faulty certificate of insurance could not relieve Cook's Roofing of its obligation to confirm the insured status of its subcontractor and prevent Hartford from being exposed to risk under the policy when the subcontractor was uninsured. The faulty certificate of insurance could not alter Hartford's rights and obligations under the policy. Thus, the trial court found that Mr. Chaidez's failure to maintain workers' compensation insurance while working for Cook's Roofing resulted in additional risk exposure to Hartford under the Cook's Roofing workers' compensation policy.

The trial court found that Hartford conducted a standard retrospective premium audit on the 2005-2006 policy, and because Mr. Chaidez had worked for Cook's Roofing from January to June 2006 without insurance coverage, additional premium accrued on the Cook's Roofing policy to account for the additional risk occasioned by his employment. The trial court found that the audit indicated that Cook's Roofing owed $30,583 for the 2005-2006 premium, which Cook's Roofing refused to pay, leading to cancellation of the 2006-2007 policy. It found that Cook's Roofing also owed $35,674 in premium for the 2006-2007 policy period at the time of cancellation. The court found that Cook's Roofing owed a total of $66,212.[10]

The trial court found that the damages allegedly suffered by Cook's Roofing originated with its failure to satisfy its own obligation to verify Mr. Chaidez's insurance status while he worked as its subcontractor. It found that Cook's Roofing presented inadequate argument in response to the motion for summary judgment regarding the elements of its claims for negligence, violation of the TCPA, and promissory estoppel, and

---

[10] The trial court's written order states that a total of $66,212 was owed, with the two policy premiums equaling $30,583 and $35,674. The trial court apparently interposed the last two numbers of the premium for 2005-2006, stating that it was $30,5<u>83</u> rather than $30,5<u>38</u> as reflected on Hartford's bill. The numbers utilized by the trial court would not add up to $66,212.

therefore, it had waived or conceded those issues. More specifically, the trial court found that Cook's Roofing failed to clearly articulate and establish any legal duty in tort owed by Hartford, the breach of which caused an injury. It found no unfair or deceptive practice, for purposes of the TCPA claim, where the plain language of the certificate of insurance alerted the certificate holder that the certificate was issued as a matter of information only and conferred no rights on the certificate holder. The court found that reliance on the certificate, in the face of those warnings, was not reasonable. According to the trial court, Cook's Roofing simply failed to raise any disputed material facts as to its claims. Consequently, the trial court dismissed the claims asserted by Cook's Roofing and entered summary judgment in favor of Hartford on its counterclaim for $66,212.[11]

Cook's Roofing prematurely filed a notice of appeal even though Hartford's request for prejudgment interest had not yet been resolved. Hartford filed a motion to dismiss the appeal for lack of a final order. This Court entered an order directing the appellant to obtain entry of a final judgment in the trial court.

Before the trial court, in addition to filing a motion for prejudgment interest, Hartford also filed a motion to enforce the judgment against the Cooks individually. According to the motion, Hartford had sought to execute on the judgment and learned through post-judgment discovery that Cook's Roofing had no assets. Hartford asserted that the Cooks were the alter egos of the corporation and that they used the corporate form as a sham to perpetuate a fraud. Hartford claimed that the Cooks had ignored corporate formalities, operated the corporation from their home, and taken the only company assets for personal use after they closed the business. Thus, Hartford asked the trial court to pierce the corporate veil and allow it to execute the judgment against Mr. and Mrs. Cook. Hartford attached to its motion the post-judgment deposition testimony of Mrs. Cook in addition to a memorandum of law.

Cook's Roofing opposed any award of prejudgment interest. It also filed a brief in opposition to Hartford's motion to enforce the judgment against the Cooks individually. Cook's Roofing argued that the individual defendants must be afforded "full due process rights" in an action to pierce the corporate veil and could not be "added to a judgment" in the absence of a jury trial, if demanded. In response, Hartford maintained that it was appropriate to pierce the corporate veil in post-judgment proceedings because the corporation and the individuals are treated as a single entity.

The trial court entered an order awarding prejudgment interest to Hartford, although for a shorter period than Hartford requested, and at a rate of only one percent. The trial

---

[11] The trial court's order states, "Cook's Roofing did not dispute the premium owed through administrative proceedings with the Tennessee Department of Commerce and Insurance, as a contested case under the Tennessee Uniform Administrative Procedures Act." It did not otherwise address the parties' arguments regarding exhaustion of administrative remedies.

court denied Hartford's motion to enforce the judgment against the Cooks individually. The trial court noted that the Cooks, individually, had not been given an opportunity to defend against the alter ego theory, as there were no pleadings giving notice of the same, no discovery, and no hearing on the matter. Hartford filed a motion to alter or amend and suggested that the trial court could hold an evidentiary hearing as to whether to pierce the corporate veil. However, the trial court denied the motion.

## II.  ISSUES PRESENTED

Cook's Roofing presents the following issues, which we have slightly reworded, for review on appeal:

1.     Whether the trial court erred in denying the motion for leave to amend the complaint filed by Cook's Roofing;
2.     Whether the trial court erred in granting summary judgment in favor of Hartford on the claims asserted in the amended complaint filed by Cook's Roofing; and
3.     Whether the trial court erred in granting summary judgment in favor of Hartford on its counterclaim for $66,212.

In its posture as appellee, Hartford raises the following additional issues for review:

1.     Whether the trial court erred in only partially granting the motion for prejudgment interest; and
2.     Whether the trial court erred in denying Hartford's motion to enforce the judgment against the individual shareholders of Cook's Roofing, Inc.

For the following reasons, we affirm the judgment of the chancery court in part, we reverse in part, and we remand for further proceedings consistent with this opinion.

## III.  DISCUSSION

### A.  *Exhaustion of Administrative Remedies*

Although neither party designated it as an issue on appeal, Hartford suggests in a footnote in its brief that the case alternatively should have been dismissed for failure to exhaust administrative remedies. We will address the issue to the extent that its resolution could impact subject matter jurisdiction.

In Tennessee, "when exhaustion of administrative remedies is required by statute, the failure to do so will deprive the court of subject matter jurisdiction." *Chattanooga-Hamilton Cty. Hosp. Auth. v. UnitedHealthcare Plan of the River Valley, Inc.*, 475 S.W.3d 746, 758 (Tenn. 2015) (citing *Pickard v. Tenn. Water Quality Control Bd.*, 424 S.W.3d 511, 523 (Tenn. 2013)). However, "unless the statute providing for an administrative

remedy requires exhaustion 'by its plain words,' an administrative appeal is not mandatory." *Ready Mix, USA, LLC v. Jefferson Cty.*, 380 S.W.3d 52, 63 (Tenn. 2012) (quoting *Thomas v. State Bd. of Equalization*, 940 S.W.2d 563, 566 (Tenn. 1997)). "'[A] statute does not require exhaustion when the language providing for an appeal to an administrative agency is worded permissively.'" *Chattanooga-Hamilton Cty. Hosp. Auth.*, 475 S.W.3d at 758 (quoting *Colonial Pipeline Co. v. Morgan*, 263 S.W.3d 827, 839 (Tenn. 2008)). In the absence of a statutory mandate, the exhaustion of administrative remedies doctrine "is a matter of judicial discretion." *Ready Mix*, 380 S.W.3d at 64.

"The Tennessee legislature has provided detailed rules for contesting workers' compensation insurance premiums." *Riverport Ins. Co. v. Countrywide Payroll & HR Sols., Inc.*, No. 3:15-CV-00297, 2017 WL 4274707, at *2 (E.D. Tenn. Sept. 26, 2017). Tennessee Code Annotated section 56-5-114(c)(1) directed the Commissioner of Commerce and Insurance to implement a residual market plan and "provide a method whereby applicants for insurance, insured, and insurers may have a hearing on grievances and the right of appeal to the commissioner." Accordingly, Tennessee Code Annotated section 56-5-109 (formerly designated -309) provides a method whereby aggrieved persons "may" submit written requests for review to insurers and then "may" appeal to the Commissioner. It provides:

> AGGRIEVED PERSONS. Every insurer and rate service organization shall provide within this state reasonable means whereby any person aggrieved by the application of its rating system may be heard on written request to review the manner in which the rating system has been applied in connection with the insurance afforded.[12] If the insurer fails to grant or reject the request within thirty (30) days, the applicant may proceed in the same manner as if the application had been rejected. Any party affected by the action of the insurer on the request may, within thirty (30) days after written notice of the action, appeal to the commissioner who, after a hearing held upon not less than ten (10) days' written notice to the appellant and to the insurer, may affirm, modify, or reverse the action.

Tenn. Code Ann. § 56-5-109(b). The Department of Commerce and Insurance promulgated administrative rules to implement this law. *See* Tenn. Comp. R. & Regs. 0780-01-82-.01, *et seq*. ("The purpose of this Chapter is to: (1) Set forth requirements for

---

[12] Because of the limited issue before us on appeal, we will assume for the sake of argument that Cook's Roofing was a person "aggrieved by the application of [the] rating system" within the meaning of the statute but express no opinion as to that issue. *See* Tenn. Code Ann. § 56-5-109(b). "Rating System" is defined as "the systematic process of determining workers' compensation premium based upon rules published in the applicable manuals, workers' compensation statutes, and the insurer's rate pages." Tenn. Comp. R. & Regs. 0780-01-82-.04(11). *But see Nat'l Council on Comp. Ins. v. Gaddis*, 786 S.W.2d 240, 242 (Tenn. Ct. App. 1989) (considering an argument that an appeal did not involve a rate dispute within the meaning of the statute).

insurers and rate service organizations in providing a process whereby insureds of workers' compensation policies may request a review of the application of the insurer's or rate service organization's rating system to the insured's coverage in this state[.]") Finally, the TWCIP provided, "Persons aggrieved by the action of a TWCIP Servicing Carrier or Direct Assignment Carrier shall have the same right to appeal under TCA 56-5-309(b). A person so aggrieved may request the Plan Administrator to review the decision or actions of the insurer by filing a formal dispute."

Federal courts have concluded that the administrative remedy provided in this context is not mandatory. In *Valley Mechanical, Inc. v. BB & T Insurance Services, Inc.*, No. 1:13-CV-378, 2014 WL 2871475, at *7 (E.D. Tenn. June 24, 2014), the district court reasoned:

> Ultimately, the Court cannot conclude § 56-5-309 [now -109] contains a hard-and-fast requirement that parties exhaust administrative remedies before filing suit. Although Defendants are correct that the statute and related regulations set up a system for the administrative resolution of workers' compensation premium disputes, Defendants point to no case holding that § 56-5-309 *requires* a party exhaust administrative remedies before filing suit. Furthermore, the statute does not by its plain words make exhaustion mandatory. *See Ready Mix,* 380 S.W.3d at 63-64. Rather, the statute provides that a party "may" avail itself of that process and "may" appeal to the Commissioner. These words do not indicate that exhausting such procedures is a condition precedent to filing suit. That the statute requires insurers to set up a dispute resolution process does not render it the sole avenue for relief. Accordingly, because § 56-5-309 does not require exhaustion by its plain words, the Court cannot conclude Valley was required to exhaust its administrative remedies in Tennessee before suing in relation to its Tennessee workers.

*See also Riverport*, 2017 WL 4274707, at *3-4 (noting that when exhaustion of administrative remedies is not mandatory it is a matter of judicial discretion but deciding to require the parties to exhaust administrative remedies in disputes regarding assigned risk policies and the TWCIP); *Virginia Sur. Co., Inc. v. McMurry Constr. Co., Inc.*, No. 07-2802, 2008 WL 11322113, at *6 (W.D. Tenn. Sept. 23, 2008) (concluding that exhaustion was left to the court's discretion because Tennessee Code Annotated section 56-5-309 "nowhere mandates administrative exhaustion and uses permissive language in its description of the steps to be taken in the process of administrative review").

Here, Hartford argued in its motion for summary judgment that dismissal was appropriate for failure to exhaust administrative remedies. In its summary judgment order, the trial court simply noted that "Cook's Roofing did not dispute the premium owed through administrative proceedings with the Tennessee Department of Commerce and

Insurance[.]" The trial court apparently concluded that such an appeal was not mandatory. Given the permissive language utilized in the relevant statutes, we agree. Therefore, the trial court did not lack subject matter jurisdiction to consider this dispute.

### B. Motion to Amend

The first issue raised by Cook's Roofing is whether the trial court abused its discretion in denying its motion to file a second amended complaint. To briefly review the timeline, the original complaint was filed in 2007, and Cook's Roofing was permitted to file its first amended complaint in 2012, to which Hartford filed an amended answer. In 2014, Cook's Roofing moved for leave to file a second amended complaint to add a claim for intentional interference with prospective business relationships. This proposed claim would be based not only on Hartford's failures to provide notice of cancellation of the Chaidez policy but also on Hartford's subsequent decision to notify the TWCIP plan administrator, after cancellation of the Cook's Roofing policy, that Cook's Roofing refused to pay its outstanding premium balance, rendering it ineligible for future coverage. Cook's Roofing alleged that this action improperly caused the TWCIP administrator to "refuse to do business" with Cook's Roofing and resulted in substantial lost profits. Cook's Roofing sought modification of the existing scheduling order due to the new issues raised by the proposed amendment, noting that the case was not yet set for trial. The motion to amend was not heard until 2016. Hartford opposed the motion on the basis of undue delay and undue prejudice and also asserted that the proposed amendment was futile. After a hearing, the trial court denied the motion to amend, simply stating that it was not well taken.

"Under the Tennessee Rules of Civil Procedure, a party may amend its pleadings once as a matter of course before a responsive pleading is served." *Abdur'Rahman v. Parker*, 558 S.W.3d 606, 620 (Tenn. 2018) (citing Tenn. R. Civ. P. 15.01). When a responsive pleading has already been filed by the opposing party, "the party seeking to amend must obtain written consent of the adverse party or leave of court, 'and leave shall be freely given when justice so requires.'" *Id.* (quoting Tenn. R. Civ. P. 15.01). "'Trial courts have broad authority to decide motions to amend pleadings and will not be reversed absent an abuse of discretion.'" *Id.* (quoting *Pratcher v. Methodist Healthcare Memphis Hosps.*, 407 S.W.3d 727, 741 (Tenn. 2013)). Thus, appellate courts "will uphold the trial court's denial of a motion to amend 'so long as reasonable minds can disagree as to the propriety of the decision made.'" *Brown v. Mapco Exp., Inc.*, 393 S.W.3d 696, 701 (Tenn. Ct. App. 2012) (quoting *Eldridge v. Eldridge*, 42 S.W.3d 82, 85 (Tenn. 2001)).

Numerous factors should be considered to guide a trial court's discretionary decision regarding whether to allow an amendment of the pleadings, including "'undue delay in filing the amendment, lack of notice to the opposing party, bad faith by the moving party, repeated failure to cure deficiencies by previous amendments, undue prejudice to the opposing party, and the futility of the amendment.'" *Blackwell v. Sky High Sports Nashville Operations, LLC*, 523 S.W.3d 624, 656 (Tenn. Ct. App. 2017) (quoting *Gardiner*

*v. Word*, 731 S.W.2d 889, 891-92 (Tenn. 1987)). "'When a motion to amend is denied, the trial court should give a reasoned explanation for its action.'" *Bowman v. Benouttas*, 519 S.W.3d 586, 602 (Tenn. Ct. App. 2016) (quoting *Kincaid v. SouthTrust Bank*, 221 S.W.3d 32, 42 (Tenn. Ct. App. 2006)). Without such information, this Court cannot discern the reason behind the trial court's denial in order to determine whether the decision constituted an abuse of discretion. *Ferrell v. Miller*, No. M2013-00856-COA-R3-CV, 2013 WL 6228153, at *7 (Tenn. Ct. App. Nov. 27, 2013) (citing *Quinn-Glover v. Regional Med. Ctr. at Memphis,* No. W2011-00100-COA-R3-CV, 2012 WL 120209, at *11 (Tenn. Ct. App. Jan. 17, 2012)).

In the absence of any explanation for the denial, this Court will "remand for consideration of the request . . . and for express findings." *Ferrell*, 2013 WL 6228153, at *7; *see, e.g.*, *Bellanti v. City of Memphis*, No. W2011-01917-COA-R3-CV, 2012 WL 1974220, at *1 (Tenn. Ct. App. June 4, 2012) ("Because the trial court's order denying the City's motion to amend fails to explain the basis for its denial, we are constrained to remand the case to the trial court for entry of a reasoned explanation of its actions[.]")

Given that the trial court failed to offer any reason for its denial of the motion to amend, we are likewise constrained to reverse and remand for the trial court to reconsider the motion to amend. In the event that it is denied, the trial court must give a reasoned explanation for its decision. *See id.*

### C.   *Dismissal of the Claims Asserted by Cook's Roofing*

The next issue raised by Cook's Roofing is whether the trial court erred in granting summary judgment to Hartford on the claims asserted by Cook's Roofing in its amended complaint. Appellate courts review a trial court's decision on a motion for summary judgment de novo with no presumption of correctness. *Kershaw v. Levy*, 583 S.W.3d 544, 547 (Tenn. 2019) (citing *Beard v. Branson*, 528 S.W.3d 487, 494-95 (Tenn. 2017)). Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Tenn. R. Civ. P. 56.04. On appeal, "we make a fresh determination about whether the requirements of Rule 56 have been met." *TWB Architects, Inc. v. Braxton, LLC*, 578 S.W.3d 879, 887 (Tenn. 2019) (citing *Rye v. Women's Care Ctr. of Memphis*, 477 S.W.3d 235, 250 (Tenn. 2015)).

The claims set forth in the amended complaint included negligence, promissory estoppel, and violation of the TCPA. As previously noted, the trial court found that Cook's Roofing waived or conceded these claims due to its failure to present sufficient argument regarding the elements of the claims in response to the motion for summary judgment. However, the trial court went on to make some conclusions regarding the three claims and explain why the elements were not shown to exist in this case.

- 16 -

On appeal, the argument presented by Cook's Roofing is again lacking. In the section of its brief addressing this issue, the single citation to legal authority provided by Cook's Roofing is a one-sentence standard of review for a motion for summary judgment. It does not cite any authority regarding negligence, promissory estoppel, or violation of the TCPA, or for that matter, even *mention* the latter two claims. Instead, Cook's Roofing simply argues that the trial court "ignored important material evidence in the record." It quotes excerpts from the evidence it presented but fails to establish how this evidence would establish or even relate to any of the claims it asserted in its amended complaint. From what we can discern from the argument, Cook's Roofing is attempting to demonstrate that some facts are in dispute. However, for purposes of summary judgment, a disputed fact is only deemed *material* "if its resolution is necessary to determine the substantive claim." *Himmelfarb v. Allain*, 380 S.W.3d 35, 38 (Tenn. 2012) (citing *Mills v. CSX Transp., Inc.,* 300 S.W.3d 627, 632 (Tenn. 2009)). Cook's Roofing makes no attempt to demonstrate how the facts it claims are disputed would relate to any of the various claims alleged in the amended complaint, such as negligence, promissory estoppel, or violation of the TCPA.

Aside from its discussion of various facts, the only isolated reference to "negligence" is in the following final paragraph of the section:

> Hartford had a duty to avoid issuing the certificate of insurance needed by its insured carelessly in a maneuver that would mislead members of the public including Cook's Roofing. Cook's Roofing requested the Chaidez certificates as a member of the public, not as a Hartford policy holder. Hartford's *negligence* resulted in Cook's Roofing being led into the trap of large audit premiums by reasonable reliance upon the certificates authorized by Hartford.

(emphasis added). Hartford did not issue the certificate of insurance; Chenault Insurance Agency did. Yet Cook's Roofing includes no argument or citation to authority regarding any agency relationship or negligence claim. As Hartford noted in its brief on appeal, Cook's Roofing failed to provide "any legal analysis" with respect to this second issue. On that basis, Hartford asked this Court to deem this issue waived.

"It is not the role of the courts, trial or appellate, to research or construct a litigant's case or arguments for him or her, and where a party fails to develop an argument in support of his or her contention or merely constructs a skeletal argument, the issue is waived." *Sneed v. Bd. of Prof'l Responsibility of Supreme Court*, 301 S.W.3d 603, 615 (Tenn. 2010). Because Cook's Roofing did not construct any argument or cite any authority in its principal brief to show that the trial court erred in granting summary judgment on its claims for negligence, promissory estoppel, or violation of the TCPA, the second issue it raised

on appeal is waived.[13]

### D. Hartford's Counterclaim

The final issue raised by Cook's Roofing is whether the trial court erred in awarding a judgment for $66,212 to Hartford on its counterclaim for breach of contract. Again, Cook's Roofing cites no authority in support of this issue. However, it does not appear to dispute the substantive merits of the breach of contract claim that served as the basis for the counterclaim. Instead, Cook's Roofing disputes the *amount* of the judgment awarded.[14] It argues that "the trial court committed large error by accepting for summary judgment purposes Hartford's claim to an entitlement to a $66,21[2] recovery for unpaid premiums[.]" Cook's Roofing basically challenges the amount of the award on two grounds. First, it argues that the sum of $35,674 sought by Hartford for the 2006-2007 policy period was impermissibly based on the policy premium *estimate* for that period rather than a post-cancellation audit. Second, Cook's Roofing argues that even if the premium estimate figure is used for the 2006-2007 policy, that amount should be prorated based on a shortened policy period of only five months prior to cancellation.

On August 30, 2006, Hartford sent a "premium bill" to Cook's Roofing for a total of $66,212. The bill reflects that Cook's Roofing owed $30,538 toward the "revised audit" for the 2005-2006 policy and $35,674 toward the existing 2006-2007 policy, which was to be effective from June 2, 2006, to June 2, 2007. Cook's Roofing was paying its premium for the 2006-2007 renewed policy by installments or a "pay plan." The bill showed a breakdown of the charges owed for the 2006-2007 policy premium:

| INSTALLMENT | DUE DATE | 09/02/06 | $569.00 |
|---|---|---|---|
| ENDORSEMENT | EFFECTIVE DATE | 06/02/06 | $16,478.00 |
| ENDORSEMENT | EFFECTIVE DATE | 07/02/06 | $4,799.00 |
| ENDORSEMENT | EFFECTIVE DATE | 08/02/06 | $4,799.00 |
| ENDORSEMENT | EFFECTIVE DATE | 09/02/06 | $4,230.00 |
| ENDORSEMENT | EFFECTIVE DATE | 10/02/06 | $4,799.00 |
| | | | ------------ |

---

[13] Cook's Roofing attempted to develop some arguments regarding its claims in its reply brief. "Reply briefs, however, are generally not a vehicle to correct deficiencies in initial briefs." *Augustin v. Bradley Cty. Sheriff's Office*, 598 S.W.3d 220, 227 (Tenn. Ct. App. 2019). "A reply brief is a response to the arguments of the appellee." *Owens v. Owens*, 241 S.W.3d 478, 499 (Tenn. Ct. App. 2007). "Because an appellee may not respond to a reply brief, it would be fundamentally unfair to allow the appellant to assert additional arguments in the reply brief." *Meersman v. Regions Morgan Keegan Tr.*, No. M2017-02043-COA-R3-CV, 2018 WL 4896660, at *3 n.7 (Tenn. Ct. App. Oct. 9, 2018) *perm. app. denied* (Tenn. Feb. 20, 2019).

[14] Cook's Roofing does suggest that the counterclaim should have been denied "on unjust enrichment grounds," but it does not cite any authority in support of this issue. Therefore, we deem the argument waived. *See Sneed*, 301 S.W.3d at 615.

SUB-TOTAL     $35,674.00

When Cook's Roofing failed to pay the bill, the 2006-2007 policy was cancelled effective November 10, 2006.

The corporate designee for Hartford explained the premium calculation during her deposition. She testified that after the revised audit premium was added to the 2005-2006 policy, the payroll amounts determined from that audit were applied to the existing renewed policy for 2006-2007 as well. She said it is typical after a worker's compensation policy audit to add any additional payroll from the prior period to the renewed existing policy. She pointed out that Cook's Roofing was on an installment plan and that the premium bill listed the amounts due. She clarified that the amount listed was not past due but the amount currently owed. The bill listed a due date of "9/26/06." When asked if the sum of $35,674 was the amount owed for the entire period, she said it appeared to be the amount "for the installments up through 10/2/06." She noted that the policy was cancelled effective November 10, 2006. When asked again about the calculation of the sum of $35,674 shown as due toward the 2006-2007 policy period, she said,

> [W]hat I believe happened was, the payroll that was picked up from Chaidez on the 2005 to 2006 policy was then applied to the 2006 to 2007. That's done in a lump sum, and then it's the total -- that would be the total *estimated* premium at that time until that policy runs out -- until the policy expires. So whatever is due and owing for those installments is just divided by how many installments there are.

(emphasis added).

Hartford's counterclaim described "a premium audit" conducted after expiration of the policy period, which revealed that Cook's Roofing owed $30,538 toward the 2005-2006 policy premium. It alleged that the same audit revealed that Cook's Roofing owed over $30,000 for the renewed 2006-2007 policy. The counterclaim alleges, "To date, these outstanding premium amounts are due and owing." Hartford sought summary judgment on its breach of contract claim for $66,212. In its statement of undisputed facts, Hartford included the following statement: "*At the time [of] its cancellation*, Cook's Roofing also owed $35,674.00, on the 2006-2007 Cook's Policy, which Cook's Roofing has not paid." (emphasis added) Thus, it is apparent that Hartford was seeking to recover the precise amount it billed Cook's Roofing before it cancelled the renewed policy for 2006-2007. The trial court awarded a judgment on the counterclaim for $66,212, the exact amount listed on the premium bill. There is simply nothing in the record to suggest that Hartford ever conducted a post-cancellation audit to determine the actual payroll and other information for the policy period and calculate whether the actual liability of Cook's Roofing was more or less than the estimated premium.

- 19 -

The insurance policy included the following terms regarding calculation of the premium:

**E. Final Premium**
The premium shown on the Information Page, schedules, and endorsements is an estimate. The final premium will be determined after this policy ends by using the actual, not the estimated, premium basis and the proper classifications and rates that lawfully apply to the business and work covered by this policy. If the final premium is more than the premium you paid to us, you must pay us the balance. If it is less, we will refund the balance to you. The final premium will not be less than the highest minimum premium for the classifications covered by this policy.

If this policy is canceled, final premium will be determined in the following way unless our manuals provide otherwise:
1. If we cancel, final premium will be calculated pro rata based on the time this policy was in force. Final premium will not be less than the pro rata share of the minimum premium.
2. If you cancel, final premium will be more than pro rata; it will be based on the time this policy was in force, and increased by our short-rate cancellation table and procedure. Final premium will not be less than the minimum premium.

**F. Records**
You will keep records of information needed to compute premium. You will provide us with copies of those records when we ask for them.

**G. Audit**
You will let us examine and audit all your records that relate to this policy. These records include ledgers, journals, registers, vouchers, contracts, tax reports, payroll and disbursement records, and programs for storing and retrieving data. We may conduct the audits during regular business hours during the policy period and within three years after the policy period ends. Information developed by audit will be used to determine final premium.

In response to the motion for summary judgment, Cook's Roofing disputed the amount owed for the 2006-2007 policy term as uncertain because there was no post-cancellation audit for the shortened policy term. According to Cook's Roofing, the amount sought by Hartford was based on the estimate for the twelve-month policy, which was to be adjusted by an audit at the end of the policy period. Thereafter, Hartford submitted an affidavit of its corporate representative stating:

[D]espite my deposition testimony regarding the amount of premiums

Cook's Roofing owes to Hartford under the relevant policies, it appears from reviewing the Plaintiff's response that it is confused regarding this issue. It should not be. To be clear, Cook's Roofing currently owes $66,212.00 in premium, Hartford having credited any and all amounts that Cook's Roofing may have paid towards its premium obligation.

However, the affidavit did not state whether a post-cancellation audit was completed or attempted.[15] Before the trial court, Hartford's counsel simply suggested that the argument by Cook's Roofing about the lack of a final audit "reflects its profound ignorance with how these assigned risk plans are administered."

The trial court made lengthy findings in its order but did not mention anything about the lack of a post-cancellation audit for the 2006-2007 policy. It simply stated:

> 43. Travelers proceeded to conduct its standard retrospective premium audit on the Cook's Policy *for the 2005-2006 Cook's Policy Period*. Because the Chaidez Policy had been effectively cancelled on January 3, 2006, Mr. Chaidez continued to work for Cook's Roofing without his own workers compensation insurance.
> 44. However, because the Chaidez Policy had been effectively cancelled on January 3, 2006, and Mr. Chaidez continued to work for Cook's Roofing without his own workers compensation insurance, this caused additional premium to accrue on the Cook's Policy to account for the additional risk occasioned by Mr. Chaidez employment during the 2005-2006 Cook's Policy Period.
> 45. During the physical audit, Cook's Roofing failed to produce sufficient documents supporting its position with regard to Mr. Chaidez. As a result, the auditor made a reasonable premium calculation based on the documents produced. Having failed to comply with its obligations during the audit process, Cook's Roofing cannot raise this issue again in this proceeding.
> 46. The final results of the audit indicated that — at that time — Cook's

---

[15] We note that "[b]oth the insurance company and the insured employer have responsibilities in the required retrospective premium audit." *Am. Zurich Ins. Co.*, 2012 WL 3064650, at *11. If a dispute arises, "the burden is on the insured employer to establish that its workers should be excluded from premium consideration." *Id.*

Notably, the corporate representative for Hartford testified that after the *Chaidez* policy was cancelled on January 3, 2006, Hartford conducted a post-cancellation audit of the *Chaidez* policy in February 2006, which included the initial policy period and also a shortened policy period for the second term up to the date of cancellation. We note that other cases involving similar policies have also discussed post-cancellation audits. *See, e.g.*, *Cont'l Cas. Co. v. Theraco, Inc.*, 437 S.W.3d 841, 845 (Tenn. Ct. App. 2014); *Am. Zurich Ins. Co.*, 2012 WL 3064650, at *6; *Liberty Mut. Ins. Co. v. Friendship Home Health Agency, LLC*, No. M2007-02787-COA-R3-CV, 2009 WL 736659, at *1 (Tenn. Ct. App. Mar. 19, 2009); *CNA (Cont'l Cas.) v. King*, No. M2004-02911-COA-R3-CV, 2006 WL 2792159, at *2 (Tenn. Ct. App. Sept. 28, 2006).

Roofing owed additional premium in the amount of $30,5[38].00 for the 2005-2006 Cook's Policy Period.

47. Cook's Roofing refused to pay the additional premium assessed, and the Cook's Policy was therefore cancelled during the 2006-2007 Cook's Policy Period in accordance with the terms of the Cook's Policy, Tennessee law, and the TWCIP.

48. *At the time of the Cook's Policy's cancellation*, Cook's Roofing also owed $35,674.00 in premium for the 2006-2007 Cook's Policy Period for a total premium owed in the amount of $66,212.00 on the Cook's Policy.

Viewing the evidence in the light most favorable to Cook's Roofing, we conclude that genuine issues of material fact remain as to whether Hartford should have conducted a post-cancellation audit of the 2006-2007 policy and whether its alleged failure to do so now impacts its claim for recovery of the unpaid estimated premium that was owed at the time of cancellation.

We note, however, that in response to the motion for summary judgment, Cook's Roofing limited its dispute to the amount owed for the 2006-2007 policy period. Cook's Roofing did not demonstrate that any genuine issue of material fact existed with respect to the amount it owed for the 2005-2006 policy period. As such, we affirm the trial court's judgment in favor of Hartford on its counterclaim for the sum of $30,538 for the 2005-2006 policy period. We reverse the judgment for $35,674 allegedly owed for the 2006-2007 policy period and remand for further proceedings regarding that issue.

### E. Prejudgment Interest

We now consider the issues raised on appeal by Hartford. First, Hartford argues that the trial court erred in limiting its award of prejudgment interest to a shorter period than Hartford requested and at a rate of only one percent.

Because we have reversed the portion of the award attributable to the 2006-2007 policy period premium, we also reverse the award of prejudgment interest for that portion of the original award. However, we will consider Hartford's arguments as they relate to interest on the 2005-2006 premium.

When Hartford filed its motion for prejudgment interest in 2019, it pointed out that it had been without the benefit of the premium since it sent the bill in 2006. However, Hartford limited its request for prejudgment interest to the period since it had completed its discovery on June 15, 2012. Hartford claimed that after that date, it was waiting on Cook's Roofing to take depositions. Thus, Hartford sought a total interest award of $43,119 on the judgment of $66,212. In opposition, Cook's Roofing argued that prejudgment interest was inappropriate due to the uncertainty regarding the lack of a post-cancellation audit for the 2006-2007 policy period.

The trial court granted Hartford's motion for prejudgment interest in part. The trial court found that an award of prejudgment interest would compensate Hartford for the loss of premium funds to which it was entitled. It found that the amount owed was certain and that Hartford sent the premium bill to Cook's Roofing demanding payment in 2006. It found that Hartford was without the use of the funds until judgment was entered in 2018. The trial court acknowledged Hartford's argument regarding "the lengthy time in which the case has been pending." However, the trial court found that "a number of factors" contributed to the length of the litigation, and the court noted that it did not attribute the lack of prosecution "wholly" to the inaction of Cook's Roofing. The trial court stated that it had considered "the entirety of the circumstances" and found it equitable to award prejudgment interest for a period spanning from September 16, 2016, to the date of judgment on December 18, 2018. The trial court set the rate of prejudgment interest at one percent. Hartford did not offer any argument or evidence to support a specific rate of interest on its claim, but it argues on appeal that the trial court should have awarded interest at the "market rate" of six percent and for the full period requested by Hartford.

Pursuant to Tennessee Code Annotated section 47-14-123, unless otherwise provided, prejudgment interest "may be awarded by courts or juries in accordance with the principles of equity at any rate not in excess of a maximum effective rate of ten percent (10%) per annum." Trial courts are vested with considerable discretion when determining whether prejudgment interest is warranted, but the decision "is not immunized from challenge on appeal." *E Sols. for Buildings, LLC v. Knestrick Contractor, Inc.*, No. M2018-02028-COA-R3-CV, 2019 WL 5607473, at *12 (Tenn. Ct. App. Oct. 30, 2019) *perm. app. denied* (Tenn. Mar. 26, 2020). "'[A]ppellate deference is not synonymous with rubber stamping a trial court's decision.'" *Id.* (quoting *Scholz v. S.B. Int'l, Inc.*, 40 S.W.3d 78, 82 (Tenn. Ct. App. 2000)). We must review "whether the trial court has based its decision on applicable legal principles and whether the decision is consistent with the evidence." *Scholz*, 40 S.W.3d at 82-83 (citing *Myint v. Allstate Ins. Co.,* 970 S.W.2d 920, 927 (Tenn. 1998); *Overstreet v. Shoney's, Inc.,* 4 S.W.3d 694, 709 (Tenn. Ct. App. 1999)). "The trial court's discretion 'extends not only to awarding of prejudgment interest but also to the amount of interest allowed and the time over which it shall be calculated.'" *Mabey v. Maggas*, No. M2006-02689-COA-R3-CV, 2007 WL 2713726, at *10 (Tenn. Ct. App. Sept. 18, 2007) (quoting *AHCI, Inc. v. Lamar Adver. of Tenn., Inc.,* No. 03A01-9301-CH-00010, 1994 WL 25848, at *4 (Tenn. Ct. App. E.S. Jan. 26, 1994), *aff'd,* 898 S.W.2d 191 (Tenn. 1995)); *see also Premier Imaging/Med. Sys., Inc. v. Coffey Family Med. Clinic, P.C.*, No. E2017-02186-COA-R3-CV, 2018 WL 3361067, at *8 (Tenn. Ct. App. July 10, 2018) (explaining that the trial court's choice of a particular rate, subject to the statutory limit, was a discretionary matter for the trial court).

According to the Tennessee Supreme Court,

Several principles guide trial courts in exercising their discretion to

- 23 -

award or deny prejudgment interest. Foremost are the principles of equity. Tenn. Code Ann. § 47-14-123. Simply stated, the court must decide whether the award of prejudgment interest is fair, given the particular circumstances of the case. In reaching an equitable decision, a court must keep in mind that the purpose of awarding the interest is to fully compensate a plaintiff for the loss of the use of funds to which he or she was legally entitled, not to penalize a defendant for wrongdoing. *Mitchell v. Mitchell*, 876 S.W.2d 830, 832 (Tenn. 1994); *Otis* [*v. Cambridge Mut. Fire Ins. Co.*, 850 S.W.2d 439, 446 (Tenn. 1992))].

*Myint*, 970 S.W.2d at 927.

Over the years, "the Tennessee Supreme Court has shifted the balance to favor awarding prejudgment interest whenever doing so will more fully compensate plaintiffs for the loss of use of their funds." *Scholz*, 40 S.W.3d at 83. In almost all cases, fairness will "require that a successful plaintiff be fully compensated by the defendant for all losses caused by the defendant, including the loss of use of money the plaintiff should have received." *Id.* "That is not to say that trial courts must grant prejudgment interest in absolutely every case." *Id.* Some equitable factors for the court's consideration include: "(1) promptness in the commencement of a claim, (2) unreasonable delay of the proceedings by either party, (3) abusive litigation practices by either party, (4) the certainty of the existence of an underlying obligation, (4) the certainty of the amount in dispute, and (5) prior compensation for the lost time value of the plaintiff's money." *Poole v. Union Planters Bank, N.A.*, 337 S.W.3d 771, 791 (Tenn. Ct. App. 2010).

Here, the trial court's stated reason for awarding but limiting the amount of prejudgment interest was that "a number of factors" contributed to the lengthy delay in this case and that it was not wholly attributable to Cook's Roofing. The trial court did not explain the significance of the starting date of September 16, 2016, and from our review of the record, we cannot discern why the trial court chose that particular date. The order simply states, "The date of September 16, 2016 is selected as the beginning date to commence the calculation of interest as being equitable to the Plaintiff [Cook's Roofing] considering the entirety of the circumstances." On appeal, Cook's Roofing references "successive vacancies in the office of Chancellor" that lasted until mid-2016. Chancellor JoeDae Jenkins, who ultimately granted summary judgment and awarded prejudgment interest, was elected in August 2016. Thus, when he began presiding over the case, it had been pending since 2007. Hartford had admittedly completed its discovery in 2012, and yet Hartford did not file its motion for summary judgment until October 2018, eleven years after the case was filed. Once the motion was finally filed, the trial court entered an order granting the motion only two months later.

The trial court is entitled to weigh the equities in determining the appropriate *amount* of prejudgment interest. *Varner Const. Co. v. Marrs*, No. W2000-01029-COA-

- 24 -

R3-CV, 2002 WL 818234, at \*14 (Tenn. Ct. App. Apr. 18, 2002) (concluding that the trial court did not abuse its discretion in declining to award interest for the entire duration of the litigation when its "extraordinary" length supported limiting the award). "Our courts have recognized that the trial courts can consider the unusual duration of litigation as a factor in reducing prejudgment interest." *Harrison v. Laursen*, 128 S.W.3d 204, 210 (Tenn. Ct. App. 2003). The court "can deny prejudgment interest when both parties are responsible for delays." *Id.*

"Others cases have awarded prejudgment interest even in the face of delays, especially where the delay was not wholly attributable to the plaintiff's conduct." *Foster-Henderson v. Memphis Health Ctr., Inc.*, 479 S.W.3d 214, 228 (Tenn. Ct. App. 2015). *See, e.g.*, *Gen. Const. Contractors Ass'n, Inc. v. Greater St. Thomas Baptist Church*, 107 S.W.3d 513, 526 (Tenn. Ct. App. 2002) (affirming an award during a two-year delay attributable to the trial court, noting that "it may seem unjust to Appellant that the meter continued to run on the accrual of interest during the time that the trial court held the case under advisement, [but] it could be viewed as equally unjust to the Appellee to discount this time in computing the total amount of damages due").

Considering the long duration of this litigation and the fact that both parties and the trial court were to some degree responsible for the delay, we cannot say that the trial court abused its discretion in deciding to award prejudgment interest but limit the award to a period of two years and at a rate of only one percent. *See MSK Constr., Inc. v. Mayse Constr. Co.*, No. E2014-00139-COA-R3-CV, 2014 WL 4826655, at \*7 (Tenn. Ct. App. Sept. 30, 2014) ("[T]he court's decision to award prejudgment interest at a statutory rate of 1 percent was wholly within the court's discretion.") "If a discretionary decision is within a range of acceptable alternatives, we will not substitute our judgment for that of the trial court simply because we may have chosen a different alternative." *3L Commc'ns L.L.C. v. Merola*, No. M2012-02163-COA-R3-CV, 2013 WL 4803532, at \*9 (Tenn. Ct. App. Sept. 6, 2013) (citing *White v. Vanderbilt Univ.,* 21 S.W.3d 215, 223 (Tenn. Ct. App. 1999)). We therefore affirm the award of prejudgment interest on the portion of the judgment attributable to the 2005-2006 policy premium.

### F.     *Piercing the Corporate Veil*

The final issue raised by Hartford on appeal is whether the trial court erred in denying its motion to enforce the judgment against the Cooks individually. To briefly review the relevant timeline, the trial court entered summary judgment against Cook's Roofing in 2018, and Cook's Roofing prematurely filed a notice of appeal before the trial court resolved the issue of prejudgment interest. This Court entered an order directing the appellant to obtain a final judgment. Before the outstanding issue of prejudgment interest was resolved, Hartford also filed a motion to enforce the judgment against the Cooks individually. According to the motion, Hartford had sought to execute on the judgment and learned through post-judgment discovery that Cook's Roofing had no assets. Hartford

asserted that Mike and Rebecca Cook were the alter egos of Cook's Roofing and that they used the corporate form as a sham to perpetuate a fraud. Hartford claimed that they simply closed the business and took the only corporate asset, a company vehicle, for their own personal use. Hartford also asserted that the Cooks ignored corporate formalities and operated the business from their home. Thus, Hartford asked the trial court to consider the factors relevant to piercing the corporate veil and enter an order allowing it to execute the judgment against the Cooks individually. Hartford submitted post-judgment deposition testimony in support of its motion.

Cook's Roofing filed a responsive brief in which it referenced the due process rights of the individual "target defendants." Cook's Roofing argued that individuals could not simply be added to a judgment without giving them "their day in court to defend their rights." Hartford filed an additional reply, claiming that it was appropriate to consider whether to pierce the corporate veil in a post-judgment proceeding.[16]

After a hearing, the trial court denied the motion. The trial court found that the Cooks had not been given an opportunity to defend on the alter ego theory, as there were no pleadings giving notice of the same, no discovery, and no hearing on those issues. Hartford filed a motion to alter or amend and indicated that it was "certainly agreeable" to having an evidentiary hearing on the alter ego issue. However, the trial court denied the motion.

It is not uncommon to encounter uncertainty as to the appropriate procedure for pursuing a claim to pierce the corporate veil. *Larry E. Parrish, P.C. v. Strong*, No. M2017-02451-COA-R3-CV, 2018 WL 6843402, at *14 (Tenn. Ct. App. Dec. 28, 2018) *perm. app. denied* (Tenn. July 25, 2019) (McBrayer, J., dissenting). "'[N]either state nor federal procedure is uniform in how veil-piercing cases are adjudicated.'" *Id.* (quoting Sam F. Halabi, *Veil-Piercing's Procedure*, 67 Rutgers U. L. Rev. 1001, 1006 (2015)). In various jurisdictions, "'[v]eil-piercing claims run the gamut from free-standing causes of action . . . to affirmative defenses to . . . equitable remedies enforced at the end of litigation.'" *Id.* (quoting Halabi, 67 Rutgers U. L. Rev. at 1016).

In Tennessee, the claim has been pursued in various ways. For instance, in *Boles v. National Development Co.*, 175 S.W.3d 226, 231-32 (Tenn. Ct. App. 2005), the plaintiffs filed suit against a corporation and later amended their complaint to add its alleged alter ego, Clyde Engle. In that particular case, because of the complexity of the issues, the trial was bifurcated into two hearings. *Id.* at 232. The first phase was limited to the plaintiffs' claim for damages against the corporation. *Id.* After they were awarded a judgment for compensatory damages against the corporation, the second phase of the trial was limited to the plaintiffs' claim that Clyde Engle was the alter ego of the corporation and thus

---

[16] The reply filed by Hartford states that the Cooks also filed a separate response individually, asserting their due process rights. However, it does not appear to be in the record on appeal.

personally liable for the damages assessed against the corporation. *Id.* Following an evidentiary hearing, the trial court pierced the corporate veil and held Engle personally liable for the judgment. *Id.* at 236. As *Boles* illustrates, "it is common for a plaintiff to bring suit against a closely held corporation and a sole shareholder individually in the same action, and to obtain judgments against both defendants." *Oceanics Sch., Inc. v. Operation Sea Cruise, Inc.*, No. 03A01-9904-CV-00153, 1999 WL 1059678, at *3 (Tenn. Ct. App. Nov. 19, 1999).

In some cases, however, the veil-piercing issue has been pursued in a separate action. For example, in *Oceanics*, 1999 WL 1059678, at *2, a foreign judgment was domesticated in Tennessee, but upon execution, no assets of the corporation were found. A year after the domestication, the plaintiff filed a motion to amend the complaint to add an individual as an additional party-defendant. *Id.* According to plaintiff's counsel, plaintiff had no reason to suspect another defendant when suit was originally filed, and it was not until post-judgment discovery that they learned facts about the individual's involvement that supported the alter ego theory. *Id.* at *3. Still, the trial court denied the request to amend the complaint because the judgment in the domestication proceeding had already become final. *Id.* at *4. This Court affirmed, emphasizing that the motion to amend the complaint came "long after the judgment was final." *Id.* We explained that "if [the plaintiff] now wishes to proceed against [the individual] in an attempt to pierce the corporate veil, a separate action must be commenced by filing a separate complaint against [the individual] on that claim." *Id.* at *2. The plaintiff did just that. The plaintiff filed a separate action against the alleged alter ego of the corporation, seeking to pierce the corporate veil and enforce the corporate judgment against the individual. *See Oceanics Sch., Inc. v. Barbour*, 112 S.W.3d 135, 137 (Tenn. Ct. App. 2003) ("*Oceanics II*"). In that separate case, the trial court found that the individual was in fact the alter ego of the corporation and allowed the plaintiff to pierce the corporate veil. This Court affirmed. *Id.*

More recently, in *Larry E. Parrish, P.C. v. Strong*, No. M2017-02451-COA-R3-CV, 2018 WL 6843402 (Tenn. Ct. App. Dec. 28, 2018) *perm. app. denied* (Tenn. July 25, 2019), this Court examined the actions taken in *Boles* and *Oceanics*. In the *Parrish* case, the litigation was already bifurcated into two phases for the consideration of compensatory and punitive damages. *Id.* at *2. After a jury awarded the plaintiff compensatory damages during phase one, but before the second phase of trial was set, the plaintiff filed a motion to hold an individual personally liable for the damages assessed against the corporate defendant. *Id.* at *2-3. The trial court denied the motion, noting the procedural posture of the case and that the compensatory damage phase had already been completed. *Id.* at *11. The trial court noted that the plaintiff would still have available to her a post-judgment remedy of suing the individual in a separate action to pierce the corporate veil. *Id.* at *12. The trial court acknowledged that this course "might not be the most efficient judicial use of resources" but reasoned that it was "the most responsible" given that there were no pleadings alleging alter ego theories but only a motion to substitute the individual as a party. *Id.* On appeal, this Court held that the trial court erred "in failing to hold a hearing

on the issue of piercing the corporate veil." *Id.* at *1. We considered the trial court's due process concerns to be "misplaced," explaining that "it comports with due process for a court to exercise jurisdiction over an individual who is an alter ego of a corporation subject to the personal jurisdiction of the court." *Id.* at *12. We also noted that only the compensatory damage phase of the bifurcated proceeding had been completed when the motion was filed. *Id.* at *13. Thus, we explained that the court could have employed a procedure similar to that used in *Boles*, where the plaintiff had amended the complaint to add the alleged alter ego and the court held a second hearing to determine whether to pierce the corporate veil. *Id.* As such, we vacated the trial court's decision and remanded for a hearing and determination in accordance with the applicable factors for piercing the corporate veil. *Id.*

Judge Neal McBrayer dissented from the majority opinion in *Parrish*, concluding that the timing of the motion regarding piercing the corporate veil weighed in favor of its denial. *Id.* at *14. He noted that when the motion was filed, the liability and compensatory damages phase had concluded, and therefore, the introduction of the new question of personal liability served to delay matters and created "a host of other issues." *Id.* (By the time the veil question was adjudicated, twelve months had expired since the jurors were first summoned for jury service, and the trial court determined that it did not have jurisdiction to re-empanel the same jury.) *Id.* at *3. Judge McBrayer believed that the trial court "took the best course" by proceeding with the punitive damage phase and leaving the plaintiff to file a separate suit against the individual. *Id.* at *14.

Considering all of these opinions, we return to the facts of the case before us. The trial court was apparently bothered by the same type of due process concerns that motivated the trial court to deny the motion without a hearing in *Parrish*. Indeed, in the case at bar, when the trial court considered the post-judgment motion to enforce the judgment against the Cooks individually, the only remaining issue was prejudgment interest. The trial court had disposed of all claims by way of summary judgment. At that time, no motions or pleadings had been filed seeking to add the Cooks as parties individually. However, our consideration of the issues on appeal has led to a different procedural posture that requires a remand for reconsideration of various issues. We have determined that it is necessary for the trial court to reconsider the motion to amend the complaint in order to give a reasoned explanation for its decision, and we have reversed the entry of summary judgment on Hartford's counterclaim as it relates to the 2006-2007 policy period. Both of those issues will require further proceedings on remand. In light of this development, we conclude that the trial court should also consider the issue of piercing the corporate veil on remand. As we said in *Parrish*, because the proceedings are still ongoing, the trial court can employ a procedure like that utilized in *Boles*, permitting amendment of the pleadings to add alleged alter egos and holding a separate evidentiary hearing to determine whether to pierce the corporate veil. *Id.* at *13. We therefore reverse the trial court's denial of the motion to enforce the judgment against the Cooks individually and remand for additional proceedings on that issue.

## IV.  CONCLUSION

For the aforementioned reasons, we affirm the decision of the chancery court in part, we reverse in part, and we remand for further proceedings consistent with this opinion. Costs of this appeal are taxed equally to the appellant, Cook's Roofing Inc., and to the appellee, Hartford Underwriters Insurance Company, for which execution may issue if necessary.

_____
CARMA DENNIS McGEE, JUDGE